UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
DOMINA SHIPMANAGEMENT LTD.,

              Plaintiff,                         08 cv 01155 (RWS)

    - against -

MEDWAY CHARTERING LTD., a/k/a MEDWAY
CHARTERING BAHAMAS, a/k/a MEDWAY
CHARTERING and INTRESCO LIMITED, a/k/a
INTRESCO LTD., a/k/a INTERSCO

              Defendants.
------------------------------------------------------------------x

### AFFIRMATION OF GEORGE M. CHALOS, ESQ. IN SUPPORT OF DEFENDANT INTRESCO LIMITED'S MOTION TO VACATE ORDER OF MARTIIME ATTACHMENT AND GARNISHMENT

        GEORGE M. CHALOS, an attorney duly admitted to practice before, *inter alia*, the Courts of the State of New York and the United States District Courts for the Southern and Eastern Districts of New York, and a Member of CHALOS, O'CONNOR & DUFFY, LLP, attorneys for the Specially Appearing parties, INTRESCO LTD (UK) and INTRESCO LTD (BVI), affirms the following to be true under penalty of perjury.

1.      I am a Member of the Bar of this Court, and a Member of the law firm, CHALOS, O'CONNOR & DUFFY, LLP, attorneys for Specially Appearing parties, Intresco (UK) and Intresco (BVI).

2.      Based on the files provided to me by my clients; my review of the prior pleadings in this matter; and my discussions and exchanges with my clients, co-counsel, as well as with counsel for Plaintiff concerning the facts and circumstances of this dispute, I am familiar with the facts and circumstances of this case, and submit this affirmation in support of

Intresco Limited's Motion to Vacate an Order of Maritime Attachment and Garnishment.

3. Intresco (BVI) is a foreign corporation, organized under the laws of the British Virgin Islands with a principal place of business in Tortola, British Virgin Islands. A copy of the Certificate of Incorporation and Articles of Association for Intresco Limited BVI are attached hereto as Exhibit "A".

4. Defendant Intresco (UK) is a foreign corporation, organized under the laws of England and Wales, with principal place of business in London, England. Intresco Limited (UK)'s Certificate of Incorporation and Articles of Association are attached hereto as Exhibit "B".

5. On or about February 5, 2008, Plaintiff DOMINA SHIPMANAGEMENT LTD. (hereinafter "Domina") filed a Verified Complaint seeking the issuance of an Order and Process of Maritime Attachment and Garnishment against Defendant Intresco. *See* Docket Entry No. 1.

6. The Verified Complaint alleges that Defendant MEDWAY CHARTERING BAHAMAS (hereinafter "Medway") has failed to pay or has wrongly deducted hire payments in violation of a Charter Party entered into between Domina and Medway. A copy of the Charter Party is attached hereto as Exhibit "C"

7. Defendant Intresco (UK) is guarantor of Medway's "performance, hire payments, and any amounts/duties/liabilities due" as to be determined in the London High Court pursuant to English Law. *See* Guarantee by

Intresco (UK) to Owners/Managers of the M/V SEAGREETING, attached

hereto as Exhibit "D".

8.   Pursuant to the Order for Process of Maritime Attachment, issued by this

Court on or about February 5, 2008, Domina has attached a total amount

of $135,115.64 through four (4) separate electronic funds transfer (EFT)

attachments.  *See* Plaintiff's Notice of Attachments, attached hereto as

Exhibits "E" through "H".

9.   All of the funds attached by Domina belong to Intresco (BVI), an innocent

third-party to which had nothing to do with the underlying charter party

and/or Intresco (UK) guarantee. Intresco (BVI) is a completely separate

and distinct corporate entity from Intresco (UK).

10.  Upon information and belief, Medway has remitted (and Domina has

accepted) $58,275.61 and this amount should be removed from the total

amount sought in the attachment.  An e-mail message (dated January 23,

2008), between Ocean Breeze Chartering S.A. and Intresco Ltd is attached

to the Affirmation of George M. Chalos as Exhibit "I".


By:  _____

Dated:  Port Washington, New York        George M. Chalos (GC-8693)
       February **20**, 2008        CHALOS O'CONNOR & DUFFY, LLP
        366 Main Street
        Port Washington, New York 11050
        Tel: (516) 767-3600
        Fax: (516) 767-3605
        Email: gmc@codus-law.com

To:    LYONS & FLOOD, LLP
65 West 36th Street, 7th Floor
New York, New York 10018
Tel: (212) 594-2400
Attn: Kirk M. Lyons, Esq.

# EXHIBIT A



# TERRITORY OF THE BRITISH VIRGIN ISLANDS

## THE INTERNATIONAL BUSINESS COMPANIES ACT
### (CAP. 291)

## CERTIFICATE OF INCORPORATION    (SECTIONS 14 AND 15)

No. 325574

The Registrar of Companies of the British Virgin Islands HEREBY CERTIFIES
pursuant to the International Business Companies Act, Cap. 291 that all
the requirements of the Act in respect of incorporation having been satisfied,

**INTRESCO LIMITED**

is incorporated in the British Virgin Islands as an International Business
Company this 20th day of May, 1999.

Given under my hand and seal at
Road Town, in the Territory of the
British Virgin Islands

REGISTRAR OF COMPANIES

CRTI0014Q

I.B.C. NO. **325574**



## TERRITORY OF THE BRITISH VIRGIN ISLANDS
### THE INTERNATIONAL BUSINESS COMPANIES ORDINANCE
(CAP: 291 OF THE LAWS OF THE BRITISH VIRGIN ISLANDS)

MEMORANDUM OF ASSOCIATION
ARTICLES OF ASSOCIATION
OF

# INTRESCO LIMITED

INCORPORATED ON THE 20TH DAY OF MAY, 1999
(AMENDED ON THE 1ST DAY OF FEBRUARY, 2002)

REGISTERED OFFICE AND REGISTERED AGENT
**MORAN & MORGAN & MORGAN TRUST CORPORATION LIMITED**
PASEA ESTATE, ROAD TOWN.
TORTOLA. BRITISH VIRGIN ISLANDS

**TERRITORY OF THE BRITISH VIRGIN ISLANDS**
**THE INTERNATIONAL BUSINESS COMPANIES ORDINANCE**
CAP. 291 OF THE LAWS OF THE BRITISH VIRGIN ISLANDS

# MEMORANDUM OF ASSOCIATION

### INDEX

| CLAUSE | PAGES |
|---|---|
| 1. Name | 1 |
| 2. Registered Office | 1 |
| 3. Registered Agent | 1 |
| 4. General Objects, Powers and Exceptions | 1 |
| 5. Capital Formation | 3 |
| 6. Amendments | 3 |
| 7. Definitions | 4 |

**1.    NAME**

The name of the Company is **INTRESCO LIMITED.**

**2.    REGISTERED OFFICE**

The Registered Office of the Company will be Pasea Estate, Road Town, Tortola, British Virgin Islands or such other place within the British Virgin Islands as the Company may from time to time by a resolution of directors determine.

**3.    REGISTERED AGENT**

The Registered Agent of the Company will be **MORGAN & MORGAN TRUST CORPORATION LIMITED**, of Pasea Estate, Road Town, Tortola, British Virgin Islands, or such other qualified person in the British Virgin Islands as the Company may from time to time by a resolution of directors determine.

**4.    GENERAL OBJECTS, POWERS AND EXCEPTIONS**

The object of the Company is to engage in any act or activity that is not prohibited under any law for the time being in force in the British Virgin Islands including but not limited to:

The purchase, sale, transfer, disposal, dealing, finance, barter, ownership, administration, giving or taking in loan, commission, mortgage, security, lease, use, usufruct, or receivership of any kind of property, whether real or personal stocks or rights, and make and accept all kinds of deals, contracts, operations, business and transactions of lawful commerce.

For such purposes the Company shall have, in addition to the powers conferred by law, the following:

(A) To sue and be sued in lawsuit;

(B) To adopt and use a corporate seal and alter it at pleasure;

(C) To acquire, construct, purchase, hold, use and convey real and personal property of every kind, and make and accept pledge, mortgage, leases, liens and encumbrances of every kind;

[D] To provide services as charterers and shipping agents;

[E] To offer services of repair of ships and all types of sea-craft, whether self-propelled or otherwise, as well as of ship engines and all types of ship equipment, and to provide for all requirements connected therewith including the provision of professional and technical services, skilled labour and other facilities including materials and spare parts;

[F] To market shipping services, to provide professional consultancy services, to provide management consultancy services, to provide technical know-how, technical, mechanical, engineering and consultancy services, to provide financial consultancy and finance brokerage to ship owning and ship operating companies, to provide crewing and manning services to sea-going vessels;

1

[G] To act as commission agents, brokers and trustees for any person, firm or company and to undertake and perform sub-contracts on their behalf;

(H) To appoint officers and agents;

(I) To enter into contracts of all kinds;

(J) To issue by-laws not inconsistent with the laws in force, for the management, regulation and government of its business and properties, for the transfer of shares, the calling and holding of meetings of stockholders and directors, and for any lawful purpose;

(K) To carry on its business and exercise its powers in foreign countries;

(L) To agree on its dissolution in accordance with the law, either by its own will or for any other cause;

(M) To borrow money and contract debts in connection with its business or for any lawful purpose;

(N) To issue bonds, notes, bills of exchange, and other obligations (which may or may not be convertible into stock of the Company) payable at a specific time or times or payable upon the happening of a specific event, whether secured by mortgage, pledge or otherwise, or unsecured, for money borrowed or in payment for property purchased or acquired or for any other lawful purpose;

(O) To guarantee, acquire, purchase, hold, sell, assign, transfer, mortgage, pledge or otherwise dispose of or deal in shares of the capital stock or bonds, or other obligations issued by other corporations or any municipality, province, state or government;

(P) To do whatever may be necessary for the accomplishment of the purposes enumerated in the Memorandum of Association or any amendment thereof necessary or incidental to the protection and benefit of the Company and, in general, to carry on any lawful business whether or not such business is similar in nature to the purpose set forth in this Memorandum of Association or in any amendment thereof.

4.1  The Company is not authorised and may not:

(1) carry on business with persons resident in the British Virgin Islands;

(2) own an interest in real property situate in the British Virgin Islands, other than a lease referred to in paragraph 4.2.5 of sub clause 4.2;

(3) carry on banking or trust business unless it is licensed under the Banks and Trust Companies Act, 1990;

(4) carry on business as an insurance or reinsurance company, insurance agent or insurance broker, unless it is licensed under an enactment authorising it to carry on that business;

(5) carry on the business of company management unless it is licensed under the Company Management Act, 1990;

(6) carry on the business of providing the registered office or the registered agent for companies incorporated in the British Virgin Islands.

4.2  In compliance with paragraph 4.1.1 of sub clause 4.1, the Company shall not be treated as carrying on business with persons resident in the British Virgin Islands if:

(1) it makes or maintains deposits with a person carrying on banking business within the British Virgin Islands;

(2) it makes or maintains professional contact with solicitors, barristers, accountants, bookkeepers, trust companies, administration companies, investment advisers or other similar persons carrying on business within the British Virgin Islands;

(3) it prepares or maintains books and records within the British Virgin Islands;

(4) it celebrates within the British Virgin Islands meetings of its directors or members;

(5) it maintains a lease of property for use as an office from which to communicate with members or where books and records of the Company are prepared or maintained;

(6) it maintains shares, debt obligations or other securities in a company incorporated under the International Business Companies Ordinance or under the Companies Act; or

(7) shares, debt obligations or other securities in the Company are owned by any person resident in the British Virgin Islands or by any company incorporated under the International Business Companies Ordinance or under the Companies Act.

2

**5. CAPITAL FORMATION**

5.1 CURRENCY

Shares in the Company shall be issued in the currency of **United States of America.**

5.2 AUTHORISED CAPITAL

The authorised capital of the Company is **Fifty Thousand Dollars US$50,000.00** divided into 50,000 shares of US$1.00 par value each.

5.3 Classes, Number and Par Value Shares

The shares shall be divided into such number of classes and series as the directors shall by resolution from time to time determine and until so divided shall comprise one class and series.

5.4 RIGHTS, QUALIFICATIONS, DESIGNATIONS, POWERS, PREFERENCES, LIMITATIONS AND RESTRICTIONS OF SHARES

The designations, powers, preferences, rights, qualifications, limitations and restrictions of each class and series of shares that the Company is authorised to issue shall be fixed by a resolution of directors, but the directors shall not allocate different rights as to voting, dividends, redemption or distributions on liquidation unless the Memorandum of Association shall have been amended to create separate classes of shares and all the aforesaid rights as to voting, dividends, redemption and distributions shall be identical in each separate class.

5.5 VARIATION OF CLASS RIGHTS

If at any time the authorised capital is divided into different classes or series of shares, the rights attached to any class or series (unless otherwise provided by the terms of issue of the shares of that class or series) may, whether or not the Company is being wound up, be varied with the consent in writing of the holders of not less than three-fourths of the issued shares of that class or series and of the holders of not less than three-fourths of the issued shares of any other class or series of shares which may be affected by such variation.

5.6 RIGHTS NOT VARIED BY THE ISSUE OF SHARES PARI PASSU

The rights conferred upon the holders of the shares of any class issued with preferred or other rights shall not, unless otherwise expressly provided by the terms of issue of the shares of that class, be deemed to be varied by the creation or issue of further shares ranking pari passu therewith.

5.7 REGISTERED OR BEARER SHARES

(1) The Company may issue all or part of its authorised shares either as registered shares or as shares to bearer.

(2) Shares issued as registered shares may be exchanged for shares issued to bearer. Shares issued to bearer may be exchanged for registered shares.

5.8 SERVICE OF NOTICE ON HOLDERS OF BEARER SHARES

Where shares are issued to bearer, the bearer, identified for this purpose by the number of the share certificate, shall be requested to provide the Company with the name and address of an agent for service of any notice, information or written statement required to be given to members, and service upon such agent shall constitute service upon the bearer of such shares until such time as a new name and address for service is provided to the Company. In the absence of such name and address being provided it shall be sufficient for the purposes of service for the Company to publish the notice, information or written statement in one or more newspapers published or circulated in the British Virgin Islands and in such other place, if any, as the Company shall from time to time by a resolution of directors or a resolution of members determine. The directors of the Company must give sufficient notice of meetings to members holding shares issued to bearer to allow a reasonable opportunity for them to secure or exercise the right or privilege, other than the right or privilege to vote, that is the subject of the notice. What amounts to sufficient notice is a matter of fact to be determined after having regarded all the circumstances.

5.9 TRANSFER OF SHARES

Registered shares in the Company may be transferred subject to the prior or subsequent approval of the Company as evidenced by a resolution of directors or by a resolution of members.

**6. AMENDMENTS**

The Company may amend its Memorandum of Association and Articles of Association by a resolution of members or by a resolution of directors.

3

7. **DEFINITIONS**

The meanings of words in this Memorandum of Association are as defined in the Articles of Association annexed hereto.

We, Caribbean Corporate Services Limited of P.O. Box 362, Road Town, Tortola, British Virgin Islands for the purpose of incorporating an International Business Company under the laws of the British Virgin Islands hereby subscribe our name to this Memorandum of Association this 20th day of May, 1999 in the presence of :-

WITNESS:                                    SUBSCRIBER:

Sgd. Grenelvia Chalwell                     Sgd. Trisha Evans

Grenelvia Chalwell                          Trisha Evans
Witness                                     for Caribbean Corporate Services Limited
C/o P.O. Box 362                            Subscriber
Road Town, Tortola                          P.O. Box 362
British Virgin Islands                      Road Town, Tortola
                                            British Virgin Islands

4



TERRITORY OF THE BRITISH VIRGIN ISLANDS
THE INTERNATIONAL BUSINESS COMPANIES ORDINANCE
CAP. 291 OF THE LAWS OF THE BRITISH VIRGIN ISLANDS

ARTICLES OF ASSOCIATION

INDEX

CLAUSE .................................................................PAGES
1. Interpretation.................................................5
2. Registered Shares................................................7
3. Bearer Shares ...................................................7
4. Shares, Authorised Capital and Capital ...............8
5. Transfer of Shares...............................................9
6. Transmission of Shares.....................................10
7. Reduction or Increase in Authorised
    Capital or Capital ...........................................10
8. Meetings and Consents of Members...................11
9. Directors............................................................13
10. Powers of Directors...........................................14
11. Proceedings of Directors....................................14
12. Officers.............................................................15
13. Conflicts of Interest ..........................................16
14. Indemnification ................................................16
15. Seal....................................................................17
16. Dividends...........................................................17
17. Accounts............................................................17
18. Audit .................................................................18
19. Notices...............................................................18
20. Pension and Superannuation Funds...................18
21. Arbitration ........................................................19
22. Voluntary Winding Up and Dissolution .............19
23. Continuation......................................................19

1.    INTERPRETATION

In these Articles, if not inconsistent with the subject of context, the following words
and expressions shall bear the meanings set below them.

1.1   CAPITAL

The sum of the aggregate par value of all outstanding shares with par value of the
Company and shares with par value held by the Company as treasury shares plus

  (1) the aggregate of the amounts designated as capital of all outstanding shares without
      par value of the Company and shares without par value held by the Company as
      treasury shares, and

  (2) the amounts as are from time to time transferred from surplus to capital by a
      resolution of directors.

1.2   MEMBER

A person who holds shares in the Company.

1.3   PERSON

An individual, a corporation, a trust, the estate of a deceased individual, a
partnership or an unincorporated association of persons.

1.4  **RESOLUTION OF DIRECTORS**

  (1)  A resolution approved at a duly constituted meeting of directors of the Company or of a committee of directors of the Company by the affirmative vote of a simple majority of the directors present who voted and did not abstain where the meeting was called on proper notice, or, if on short notice, if those directors not present have waived notice; or

  (2)  a resolution consented to in writing by all directors or by all members of the committee, as the case may be.

1.5  **RESOLUTION OF MEMBERS**

  (1)  A resolution approved at a duly constituted meeting of the members of the Company by the affirmative vote of:

    (i) a simple majority of the votes of the shares which were present at the meeting and were voted and not abstained, or

    (ii) a simple majority of the votes of each class or series of shares which were present at the meeting and entitled to vote thereon as a class or series and were voted and not abstained and of a simple majority of the votes of the remaining shares entitled to vote thereon which were present at the meeting and were voted and not abstained; or

  (2)  a resolution consented to in writing by

    (i) an absolute majority of the votes of shares entitled to vote thereon, or

    (ii) an absolute majority of the votes of each class or series of shares entitled to vote thereon as a class or series and of an absolute majority of the votes of the remaining shares entitled to vote thereon.

1.6  **SECURITIES**

Shares and debt obligations of every kind, and options, warrants and rights to acquire shares or debt obligations.

1.7  **SURPLUS**

The excess, if any, at the time of the determination, of the total assets of the Company over the sum of its total liabilities, as shown in its books of account, plus the Company's capital.

1.8  **THE MEMORANDUM**

The Memorandum of Association of the Company as originally framed or as from time to time amended.

1.9  **THE ORDINANCE**

The International Business Companies Ordinance (CAP. 291) as originally enacted or as from time to time amended.

1.10  **THE SEAL**

The Common Seal of the Company.

1.11  **THESE ARTICLES**

These Articles of Association as originally framed or as from time to time amended.

1.12  **TREASURY SHARES**

Shares of the Company that were previously issued but were repurchased, redeemed or otherwise acquired by the Company and not cancelled.

1.13  "Written" or any term of like import includes words typewritten, printed, painted, engraved, lithographed, photographed, or represented or reproduced by any mode of representing or reproducing words in a visible form, including telex, telegram, cable or other form of writing produced by electronic communication.

1.14  Save as aforesaid any words or expressions defined in the Ordinance shall bear the same meaning in these Articles.

1.15  Whenever the singular or plural number, or the masculine, feminine or neuter gender is used in these Articles, it shall equally, where the context admits, include the others.

1.16  A reference in these Articles to voting in relation to shares shall be construed as a reference to voting by members holding the shares except that it is the votes allocated to the shares that shall be counted and not the number of members who actually voted and a reference to shares being present at a meeting shall be given a corresponding construction.

1.17  A reference to money in these Articles is a reference to the currency of the United States of America unless otherwise stated.

2. **REGISTERED SHARES**

2.1 The Company shall issue to every member holding registered shares in the Company a certificate signed by a director or officer of the Company and under the Seal specifying the share or shares held by him and the signature of the director or officer and the Seal may be facsimiles.

2.2 Any member receiving a share certificate for registered shares shall indemnify and hold the Company and its directors and officers harmless from any loss or liability which it or they may incur by reason of the wrongful or fraudulent use of representation made by any person by virtue of the possession thereof. If a share certificate for registered shares is worn out or lost, it may be renewed on production of the worn out certificate or on satisfactory proof of its loss together with such indemnity as may be required by a resolution of directors.

2.3 If several persons are registered as joint holders of any shares, any one of such persons may be given an effectual receipt for any dividend payable in respect of such shares.

3. **BEARER SHARES**

3.1 Subject to a request for the issue of bearer shares and to the payment of the appropriate consideration for the shares to be issued, the Company may, to the extent authorised by the Memorandum, issue bearer shares to, and at the expense of, such person as shall be specified in the request. The Company may also upon receiving a request in writing accompanied by the share certificate for the shares in question, exchange registered shares for bearer shares or may exchange bearer shares for registered shares. Such request served on the Company by the holder of bearer shares shall specify the name and address of the person to be registered and unless the request is delivered in person by the bearer shall be authenticated as hereinafter provided. Such request served on the Company by the holder of bearer shares shall also be accompanied by any coupons or talons which at the date of such delivery have not become due for payments of dividends or any other distribution by the Company to the holders of such shares. Following such exchange the share certificate relating to the exchanged shares shall be delivered as directed by the member requesting the exchange.

3.2 Bearer share certificates shall be under the Seal and shall carry an identifying number and state that the bearer is entitled to the shares therein specified, and may provide by coupons, talon, or otherwise for the payment of dividends or other monies on the shares included therein to the address to which the bearer shares were originally sent.

3.3 Subject to the provisions of the Ordinance and of these Articles the bearer of a bearer share certificate shall be deemed to be a member of the Company and shall be entitled to the same rights and privileges as he would have had if his name had been included in the share register of the Company as the holder of the shares.

3.4 Subject to any specific provisions in these Articles, in order to exercise his rights as a member of the Company, the bearer of a bearer share certificate shall produce the bearer share certificate as evidence of his membership of the Company. Without prejudice to the generality of the foregoing, the following rights may be exercised in the following manner:

(1) for the purpose of exercising his voting rights at a meeting, the bearer of a bearer share certificate shall produce such certificate to the chairman of the meeting;

(2) for the purpose of exercising his vote on a resolution in writing, the bearer of a bearer share certificate shall cause his signature to any such resolution to be authenticated as hereinafter set forth;

(3) for the purpose of requisitioning a meeting of members, the bearer of a bearer share certificate shall address his requisition to the directors and his signature thereon shall be duly authenticated as hereinafter provided; and

(4) for the purpose of receiving dividends, the bearer of the bearer share certificate shall present at such places as may be designated by the directors any coupons or talons issued for such purpose, or shall present the bearer share certificate to any paying agent authorised to pay dividends.

3.5 The signature of the bearer of a bearer share certificate shall be deemed to be duly authenticated if the bearer of the bearer share certificate shall produce such certificate to a notary public or a bank manager or a director or officer of the Company

7

(herein referred to as an "authorised person") and if the authorised person shall endorse the document bearing such signature with a statement

(1) identifying the bearer share certificate produced to him by number and date and specifying the number of shares and the class of shares (if appropriate) comprised therein;

(2) confirming that the signature of the bearer of the bearer share certificate was subscribed in his presence and that if the bearer is representing a body corporate he has so acknowledged and has produced satisfactory evidence thereof;

(3) specifying the capacity in which he is qualified as an authorised person and, if a notary public, affixing his seal thereto, or, if a bank manager, attaching an identifying stamp of the bank of which he is a manager.

3.6  Notwithstanding any other provisions of these Articles, at any time, the bearer of a bearer share certificate may deliver the certificate for such shares into the custody of the Company at its registered office, whereupon the Company shall issue a receipt therefore under the Seal signed by a director or officer identifying by name and address the person delivering such certificate and specifying the date and number of bearer share certificates so deposited and the number of shares comprised therein. Any such receipt may be used by the person named therein for the purpose of exercising the rights vested in the shares represented by the bearer share certificate so deposited including the right to appoint a proxy. Any bearer share certificate so deposited shall be returned to the person named in the receipt or his personal representative if such person be dead and thereupon the receipt issued therefor shall be of no further effect whatsoever and shall be returned to the Company for cancellation or, if it has been lost or mislaid, such indemnity as may be required by a resolution of directors shall be given to the Company.

3.7  The bearer of a bearer share certificate shall for all purposes be deemed to be the owner of the shares comprised in such certificate and in no circumstances shall the Company or the Chairman of any meeting of members or the Company's registrars or any director or officer of the Company or any authorised person be obliged to inquire into the circumstance whereby a bearer share certificate came into the hands of the bearer thereof, or to question the validity or authenticity of any action taken by the bearer of a bearer share certificate whose signature has been authenticated as provided herein.

3.8  If the bearer of a bearer share certificate shall be a corporation, then all the rights exercisable by virtue of such shareholding may be exercised by an individual duly authorised to represent the corporation but unless such individual shall acknowledge that he is representing a corporation and shall produce upon request satisfactory evidence that he is duly authorised to represent the corporation, the individual shall for all purposes hereof be regarded as the holder of the shares in any bearer share certificate held by him.

3.9  The directors may provide for payment of dividends to the holders of bearer shares by coupons or talons and in such event the coupons or talons shall be in such form and payable at such time and in such place or places as the directors shall resolve. The Company shall be entitled to recognize the absolute right of the bearer of any coupon or talon issued as aforesaid to payment of the dividend to which it relates and delivery of the coupon or talon to the Company or its agents shall constitute in all respects a good discharge of the Company in respect of such dividend.

3.10 If any bearer share certificate, coupon or talon be worn out or defaced, the directors may, upon the surrender hereof for cancellation, issue a new one in its stead, and if any bearer share certificate, coupon or talon be lost or destroyed, the directors may upon the loss or destruction being established to their satisfaction, and upon such indemnity being given to the Company as it shall by resolution of Directors determine, issue a new bearer share certificate in its stead, and in either case on payment of such sum as the Company may from time to time by resolution of directors require. In case of loss or destruction the person to whom such new bearer share certificate, coupon or talon is issued shall also bear and pay to the Company all expenses incidental to the investigation by the Company of the evidence of such loss or destruction and to such indemnity.

## 4.    SHARES, AUTHORISED CAPITAL AND CAPITAL

4.1  Subject to the provisions of these Articles and any resolution of members the unissued shares of the Company shall be at the disposal of the directors who may without

prejudice to any rights previously conferred on the holders of any existing shares or class or series of shares, offer, allot, grant options over or otherwise dispose of the shares to such persons, at such times and upon such terms and conditions as the Company may by resolution of directors determine.

4.2 Shares in the Company shall be issued for money, services rendered, personal property, an estate in real property, a promissory note or other binding obligation to contribute money or property, or any combination of the foregoing as shall be determined by a resolution of directors.

4.3 Shares in the Company may be issued for such amount of consideration as the directors may from time to time by resolution of directors determine, except that in the case of shares with par value, the amount shall not be less than the par value and in the absence of fraud the decision of the directors as to the value of the consideration received by the Company in respect of the issue is conclusive unless a question of law is involved. The consideration in respect of the shares constitutes capital to the extent of the par value and the excess constitutes surplus.

4.4 A share issued by the Company upon conversion of, or in exchange for, another share or a debt obligation or other security in the Company, shall be treated for all purposes as having been issued for money equal to the consideration received or deemed to have been received by the Company in respect of the other share, debt obligation or security.

4.5 Treasury shares may be disposed of by the Company on such terms and conditions (not otherwise inconsistent with these Articles) as the Company may by resolution of directors determine.

4.6 The Company may issue fractions of a share and a fractional share shall have the same corresponding fractional liabilities, limitations, preferences, privileges, qualifications, restrictions, rights and other attributes of a whole share of the same class or series of shares.

4.7 Upon the issue by the Company of a share without par value, the consideration in respect of the share constitutes capital to the extent designated by the directors and the excess constitutes surplus, except that the directors must designate as capital an amount of the consideration that is at least equal to the amount that the share is entitled to as a preference, if any, in the assets of the Company upon liquidation of the Company.

4.8 The Company may purchase, redeem or otherwise acquire and hold its own shares but no purchase, redemption or other acquisition which shall constitute a reduction in capital shall be made except in compliance with Regulations 7.4 and 7.5.

4.9 Shares that the Company purchases, redeems or otherwise acquires pursuant to Regulation 4.8 may be cancelled or held as treasury shares unless the shares are purchased, redeemed or otherwise acquired out of capital and would otherwise infringe upon the requirements of Regulations 7.4 and 7.5, or to the extent that such shares are in excess of 80 percent of the issued shares of the Company, in which case they shall be cancelled but they shall be available for reissue. Upon the cancellation of a share, the amount included as capital of the Company with respect to that share shall be deducted from the capital of the Company.

4.10 Where shares in the Company are held by the Company as treasury shares or are held by another company of which the Company holds, directly or indirectly, shares having more than 50 percent of the votes in the election of directors of the other company, such shares of the Company are not entitled to vote or to have dividends paid thereon and shall not be treated as outstanding for any purpose except for purposes of determining the capital of the Company.

## 5.  TRANSFER OF SHARES

5.1 Subject to any limitations in the Memorandum, registered shares in the Company may be transferred by a written instrument of transfer signed by the transferor and containing the name and address of the transferee, but in the absence of such written instrument of transfer the directors may accept such evidence of a transfer of shares as they consider appropriate.

5.2 The Company shall not be required to treat a transferee of a registered share in the Company as a member until the transferee's name has been entered in the share register.

9

5.3 Subject to any limitations in the Memorandum, the Company must on the application of the transferor or transferee of a registered share in the Company enter in the share register the name of the transferee of the share save that the registration of transfers may be suspended and the share register closed at such times and for such periods as the Company may from time to time by resolution of directors determine provided always that such registration shall not be suspended and the share registered closed for more than 60 days in any period of 12 months.

## 6.    TRANSMISSION OF SHARES

6.1 The executor or administrator of a deceased member, the guardian of an incompetent member or the trustee of a bankrupt member shall be the only person recognized by the Company as having any title to his share but they shall not be entitled to exercise any rights as a member of the Company until they have proceeded as set forth in the next following two regulations.

6.2 Any person becoming entitled by operation of law or otherwise to a share or shares in consequence of the death, incompetence or bankruptcy of any member may be registered as a member upon such evidence being produced as may reasonably be required by the directors. An application by any such person to be registered as a member shall be deemed to be a transfer of shares of the deceased, incompetent or bankrupt member and the directors shall treat it as such.

6.3 Any person who has become entitled to a share or shares in consequence of the death, incompetence or bankruptcy of any member may, instead of being registered himself, request in writing that some person to be named by him be registered as the transferee of such share or shares and such request shall likewise be treated as if it were a transfer.

6.4 What amounts to incompetence on the part of a person is a matter to be determined by the court having regarded all the relevant evidence and the circumstances of the case.

## 7.    REDUCTION OR INCREASE IN AUTHORISED
## CAPITAL OR CAPITAL

7.1 The Company may, by a resolution of members or directors, amend the Memorandum to increase or reduce its authorised capital and in connection therewith the Company may in respect of any unissued shares increase or reduce the number of shares, increase or reduce the par value of any shares or effect any combination of the foregoing.

7.2 The Company may amend the Memorandum to

(1) divide the shares, including issued shares, of a class or series into a larger number of shares of the same class or series; or

(2) combine the shares, including issued shares, of a class or series into smaller number of shares of the same class or series; provided however, that where shares are divided or combined under (1) and (2) of Regulation 7.2, the aggregate par value of the new shares must be equal to the aggregate par value of the original shares.

7.3 The capital of the Company may, by a resolution of members or directors, be increased by transferring an amount of the surplus of the Company to capital, and, subject to the provisions of Regulations 7.4 and 7.5, the capital of the Company may be reduced by transferring an amount of the capital of the Company to surplus.

7.4 No reduction of the capital shall be effected that reduces the capital of the Company to an amount that immediately after the deduction is less than the aggregate par value of all outstanding shares with par value and all shares with par value held by the Company as treasury shares and the aggregate of the amounts designated as capital of all outstanding shares without par value and all shares without par value held by the Company as treasury shares that are entitled to a preference, if any, in the assets of the Company upon liquidation of the Company.

7.5 No reduction of capital shall be effected unless the members or directors determine that immediately after the reduction the Company will be able to satisfy its liabilities as they become due in the ordinary course of its business and that the realisable value of the assets of the Company will not be less than its total liabilities, other than deferred taxes, as shown in the books of the Company and its remaining capital, and, in the absence of fraud, the decision of the directors as to the realisable value of the assets of the Company is conclusive, unless a question of law is involved.

10

7.6  Where the Company reduces its capital the Company may

(1)  return to its members any amount received by the Company upon the issue of any of its shares;

(2)  purchase, redeem or otherwise acquire its shares out of capital; or

(3)  cancel any capital that is lost or not represented by assets having a realisable value.

## 8.    MEETINGS AND CONSENTS OF MEMBERS

8.1  The Directors of the Company may convene meetings of the members of the Company at such times and in such manner and places within or outside the British Virgin Islands as the directors consider necessary or desirable.

8.2  Upon the written request of members holding 10 percent or more of the outstanding voting shares in the Company the directors shall convene a meeting of members.

8.3  The Directors shall give not less than 7 days notice of meetings of members to those persons whose names on the date the notice is given appears as members in the share register of the Company.

8.4  A meeting of members held in contravention of the requirement in Regulation 8.3 is valid

(1)  if members holding not less than 90 percent of the total number of shares entitled to vote on all matters to be considered at the meeting, or 90 percent of the votes of each class or series of shares where members are entitled to vote thereon as a class or series together with not less than a 90 percent majority of the remaining votes, have agreed to shorter notice of the meeting, or

(2)  if all members holding shares entitled to vote on all or any matters to be considered at the meeting have waived notice of the meeting and for this purpose waiver.

8.5  The inadvertent failure of the directors to give notice of a meeting to a member, or the fact that a member has not received notice, does not invalidate the meeting.

8.6  A member may be represented at a meeting of members by a proxy who may speak and vote on behalf of the member.

8.7  The instrument appointing a proxy shall be produced at the place appointed for the meeting before the time for holding the meeting at which the person named in such instrument proposes to vote.

8.8  An instrument appointing a proxy shall be in substantially the following form or such other form as the Chairman of the Meeting shall accept as properly evidencing the wishes of the member appointing the proxy. Only members who are individuals may appoint proxies.

(Name of Company)

I/We_____

_____

being a member of the above Company with

_____ shares

HEREBY APPOINT _____

of_____

11

or failing him _____of_____

to be my/our proxy to vote for me/us at the meeting of

members to be held on the_____ day of

_____, 20_____ and at any adjournment
thereof.

(Any restrictions on voting to be inserted here)

Signed this day of_____, _____

_____
Member

8.9 The following shall apply in respect of joint ownership of shares:

(1) if two or more persons hold shares jointly each of them may be present in person or by proxy at a meeting of members and may speak as a member;

(2) if only one of the joint owners is present in person or by proxy he may vote on behalf of all joint owners; and

(3) if two or more of the joint owners are present in person or by proxy they must vote as one.

8.10 A member shall be deemed to be present at a meeting of members if he participates by telephone or other electronic means and all members participating in the meeting are able to hear each other.

8.11 A meeting of members is duly constituted if, at the commencement of the meeting, there are present in person or by proxy not less than 50 percent of the votes of the shares or class or series of shares entitled to vote on resolution of members to be considered at the meeting. If a quorum be present, notwithstanding the fact that such quorum may be represented by only one person then such person may resolve any matter and a certificate signed by such person accompanied where such person be a proxy by a copy of the proxy form shall constitute a valid resolution of members.

8.12 If within two hours from the time appointed for the meeting a quorum is not present, the meeting, if convened upon the requisition of members, shall be dissolved; in any other case it shall stand adjourned to the next business day at the same time and place or to such other time and place as the directors may determine, and if at the adjourned meeting there are present within an hour from the time appointed for the meeting in person or by proxy not less than one third of the votes of the shares or each class or series of shares entitled to vote on the resolutions to be considered by the meeting, those present shall constitute a quorum but otherwise the meeting shall be dissolved.

8.13 At every meeting of members, the Chairman of the Board of Directors shall preside as chairman of the meeting. If there is no Chairman of the Board of Directors or if the Chairman of the Board of Directors is not present at the meeting, the members present shall choose someone of their number to be the chairman. If the members are unable to choose a chairman for any reason, then the person representing the greatest number of voting shares present in person or by prescribed form of proxy at the meeting shall preside as chairman failing which the oldest individual member or representative of a member present shall take the chair.

8.14 The Chairman may, with the consent of the meeting, adjourn any meeting from time to time, and from place to place, but no business shall be transacted at any adjourned meeting other than the business left unfinished at the meeting from which the adjournment took place.

8.15 At any meeting of the members the chairman shall be responsible for deciding in such manner as he shall consider appropriate whether any resolution has been carried or not and the result of his decision shall be announced to the meeting and recorded in

the minutes thereof. If the Chairman shall have any doubt as to the outcome of any resolution put to the vote, he shall cause a poll to be taken of all votes cast upon such resolution, but if the chairman shall fail to take a poll then any member present in person or by proxy who disputes the announcement by the chairman of the result of any vote may immediately following such announcement demand that a poll be taken and the chairman shall thereupon cause a poll to be taken. If a poll is taken at any meeting, the result thereof shall be duly recorded in the minutes of that meeting by the chairman.

8.16 Any person other than an individual shall be regarded as one member and subject to Regulation 8.17 the right of any individual to speak for or represent such member shall be determined by the law of the jurisdiction where, and by the documents by which, the person is constituted or derives its existence. In case of doubt, the directors may in good faith    seek legal advice from any qualified person and unless and until a court of competent jurisdiction shall otherwise rule, the directors may rely and act upon such advice without incurring any liability to any member.

8.17 Any person other than an individual which is a member of the Company may by resolution of its directors or other governing body authorise such person as it thinks fit to act as its representative at any meeting of the Company or of any class of members of the Company, and the person so authorised shall be entitled to exercise the same powers on behalf of the person which he represents as that person could exercise if it were an individual member of the Company.

8.18 The chairman of any meeting at which a vote is cast by proxy or on behalf of any person other than an individual may call for a notarially certified copy of such proxy or authority which shall be produced within 7 days of being so requested or the votes cast by such proxy or on behalf of such person shall be disregarded.

8.19 Directors of the Company may attend and speak at any meeting of members of the Company and at any separate meeting of the holders of any class or series of shares in the Company.

## 9.   DIRECTORS

9.1 The first directors of the Company shall be elected by the subscribers to the Memorandum; and thereafter, the directors shall be elected by the members for such term as the members may determine. The directors may also elect directors for such term as the directors may determine.

9.2 The minimum number of directors shall be one and the maximum number shall  be ten.

9.3 Each director shall hold office for the term, if any, fixed by resolution of members or until his earlier death, resignation or removal.

9.4 A director may be removed from office, with or without cause, by a resolution of members.

9.5 A director may resign his office by giving written notice of his resignation to the Company and the resignation shall have effect from the date the notice is received by the Company or from such later date as may be specified in the notice.

9.6 A vacancy in the Board of Directors may be filled by a resolution of members or by a resolution of a majority of the remaining directors.

9.7 With the prior or subsequent approval by a resolution of members, the directors may, by a resolution of directors, fix the emoluments of directors with respect to services to be rendered in any capacity to the Company.

9.8 A director shall not require a share qualification, and may be an individual or a company.

## 10.   POWERS OF DIRECTORS

10.1 The business and affairs of the Company shall be managed by any one director of the Company acting severally. In particular, any one director shall be entitled to enter into any agreement on behalf of the Company and any one director may exercise all such powers of the Company as are not by the Ordinance or by the Memorandum of these Articles required to be exercised by the members of the Company, subject to any delegation of such powers as may be authorised by these Articles and to such requirements as may be prescribed by a resolution of members; but no requirements made by a resolution of members shall prevail if it be inconsistent with these Articles

nor shall such requirement invalidate any prior act of the directors which would have been valid if such requirement had not been made.

10.2 A director of the Company is empowered to appoint another person in his or her stead, by means of a written instrument, and such person so appointed shall enjoy all the powers of the director appointing him. A power of attorney executed by any one of the directors shall be considered as executed by the Company.

10.3 Any person appointed by the Company to act as the Company's agent has such powers and authority of the directors, including the power and authority to affix the Seal, as are set forth in these Articles, except that no agent has any power or authority with respect to fixing the emoluments of directors.

10.4 Any director which is a body corporate may appoint any person its duly authorised representative for the purpose of representing it at meetings of the Board of Directors or with respect to unanimous written consents.

10.5 The continuing directors may act notwithstanding any vacancy in their body, save that if their number is reduced below the number fixed by or pursuant to these Articles as the necessary quorum for a meeting of directors, the continuing directors or director may act only for the purpose of appointing directors to fill any vacancy that has arisen or summoning a meeting of members.

10.6 All cheques, promissory notes, drafts, bills of exchange and other negotiable instruments and all receipts for monies paid to the Company, shall be signed, drawn, accepted, endorsed, or otherwise executed, as the case may be, by any one of the director of the company.

## 11. PROCEEDINGS OF DIRECTORS

11.1 The Directors of the Company or any committee thereof may meet at such times and in such manner and places within or outside the British Virgin Islands as the directors may determine to be necessary or desirable.

11.2 A director shall be deemed to be present at a meeting of directors if he participates by telephone or other electronic means and all directors participating in the meeting are able to hear each other.

11. 3 A director shall be given not less than 7 days notice of meetings of directors, but a meeting of directors held without 7 days notice having been given to all directors shall be valid if all the directors entitled to vote at the meeting who do not attend, waive notice of the meeting. The inadvertent failure to give notice of a meeting to a director or the fact that a director has not received the notice, does not invalidate the meeting.

11.4 A director may by a written instrument appoint an alternate who need not to be a director and an alternate is entitled to attend meetings in the absence of the director who appointed him and vote or consent in place of the director.

11.5 A meeting of directors is duly constituted for all purposes if at the commencement of the meeting there are present in person or by alternate not less than one half of the total number of directors.

11.6 If the Company shall have only one director the provisions herein contained for meetings of the directors shall not apply but such sole director shall have full power to represent and act for the Company in all matters as are not by the Ordinance or the Memorandum or these Articles required to be exercised by the members of the Company and in lieu of minutes of a meeting shall record in writing and sign a note or memorandum of all matters requiring a resolution of directors. Such a note or memorandum shall constitute sufficient evidence of such resolution for all purposes.

11.7 At every meeting of the directors the Chairman of the Board of Directors shall preside as chairman of the meeting. If there is no Chairman of the Board of Directors or if the Chairman of the Board of Directors is not present at the meeting the Vice Chairman of the Board of Directors shall preside. If there is no Vice Chairman of the Board of Directors or if the Vice Chairman of the Board of Directors is not present at the meeting the Directors present shall choose someone of their number to be chairman of the meeting.

11.8 The directors shall cause the following corporate records to be kept:

  (1) minutes of all meetings of directors, members, committees of directors, committees of officers and committees of members;

  (2) copies of all resolutions consented to by directors, members, committees of directors, committees of officers and committees of members; and

  (3) such other accounts and records as the directors by resolution of directors consider necessary or desirable in order to reflect the financial position of the Company.

11.9 The books, records and minutes shall be kept at the registered office of the Company or at such other place as the directors determine.

11.10 The directors may, by a resolution of directors, designate one or more committees, each consisting of one or more directors.

11.11 Each committee of directors has such powers and authorities of the directors, including the power and authority to affix the Seal, as are set forth in the resolution of directors establishing the committee, except that no committee has any power or authority either to amend the Memorandum or these Articles or with respect to the matters requiring a resolution of directors under Regulations 9.6., 9.7. and 10.2.

11.12 The meetings and proceedings of each committee of directors consisting of two or more directors shall be governed mutatis mutandis by the provisions of these Articles regulating the proceedings of directors so far as the same are not superseded by any provisions in the resolution establishing the committee.

## 12.   OFFICERS

12.1 The Company may by resolution of directors appoint officers of the Company at such times as shall be considered necessary or expedient. Such officers may consist of a Chairman of the Board of Directors, a Vice Chairman of the Board of Directors, President and one or more Vice Presidents, Secretaries and Treasurers and such other officers as may from time to time be deemed desirable. Any number of offices may be held by the same person.

12.2 The officers shall perform such duties as shall be prescribed at the time of their appointment subject to any modification in such duties as may be prescribed thereafter by resolution of directors or resolution of members, but in the absence of any specific allocation of duties it shall be the responsibility of the Chairman of the Board of Directors to preside at meetings of directors and members, the Vice Chairman to act in the absence of the Chairman, the President to manage the day to day affairs of the Company, the Vice Presidents to act in order of seniority in the absence of the President but otherwise to perform such duties as may be delegated to them by the

15

President, the Secretaries to maintain the share register, minute books and records (other than financial records) of the Company and to ensure compliance with all procedural requirements imposed on the Company by applicable law, and the Treasurer to be responsible for the financial affairs of the Company.

12.3 The emoluments of all officers shall be fixed by a resolution of directors.

12.4 The officers of the Company shall hold office until their successors are duly elected and qualified, but any officer elected or appointed by the directors may be removed at any time, with or without cause, by resolution of directors. Any vacancy occurring in any office of the Company may be filled by resolution of directors.

12.5 The Registered Agent may certify to whom it may concern, the names and addresses of the directors and officers of the Company and the terms of their incumbency.

## 13. CONFLICTS OF INTERESTS

13.1 No agreement or transaction between the Company and one or more of its Directors or any person in which any director has a financial interest or to whom any director is related, including as a director of that other person, is void or voidable for this reason only or by reason only that the director is present at the meeting of directors or at the meeting of the committee of directors that approves the agreement or transaction or that the vote or consent of the director is counted for that purpose if the material facts of the interest of each director in the agreement or transaction and his interest in or relationship to any other party to the agreement or transaction are disclosed in good faith or are known by the other directors.

13.2 A Director who has an interest in any particular business to be considered at a meeting of directors or members may be counted for purposes of determining whether the meeting is duly constituted.

## 14. INDEMNIFICATION

14.1 Subject to Regulation 14.2, the Company shall indemnify against all expenses, including legal fees, and against all judgments, fines and amounts paid in settlement and reasonably incurred in connection with legal, administrative or investigative proceedings any person who

(1) is or was a party or is threatened to be made a party to any threatened, pending or completed proceedings, whether civil, criminal, administrative or investigative, by reason of the fact that the person is or was a director, an officer or a liquidator of the Company; or

(2) is or was, at the request of the Company, serving as a director, officer or liquidator of, or in any other capacity is or was acting for, another company or a partnership, joint venture, trust or other enterprise.

14.2 Regulation 14.1 only applies to a person referred to in that Regulation if the person acted honestly and in good faith with a view to the best interests of the Company and, in the case of criminal proceedings, the person had no reasonable cause to believe that his conduct was unlawful.

14.3 The decision of the directors as to whether the person acted honestly and in good faith and with a view to the best interests of the Company and as to whether the person had no reasonable cause to believe that his conduct was unlawful is, in the absence of fraud, sufficient for the purposes of this Regulation 14, unless a question of law is involved.

14.4 The termination of any proceedings by any judgment, order, settlement, conviction or the entering of a nolle prosequi does not, by itself, create a presumption that the person did not act honestly and in good faith and with a view to the best interests of the Company or that the person had reasonable cause to believe that his conduct was unlawful.

14.5 If a person referred to in Regulation 14.1 has been successful in defense of any proceedings referred to in that Regulation, the person is entitled to be indemnified against all expenses, including legal fees, and against all judgments, fines and amounts paid in settlement and reasonably incurred by the person in connection with the proceedings.

14.6 The Company may purchase and maintain insurance in relation to any person who is or was a director, an officer or a liquidator of the Company, or who at the request of

16

the Company is or was serving as a director, an officer or a liquidator of, or in any other capacity is or was acting for another company or a partnership, joint venture, trust or other enterprise, against any liability asserted against the person and incurred by the person in that capacity, whether or not the Company has or would have had the power to indemnify the person against the liability under Regulation 14.1.

15. **SEAL**

The directors shall provide for the safe custody of the Seal. The Seal when affixed to any written instrument shall be witnessed by a director or any other person so authorised from time to time by resolution of directors. The directors may provide for a facsimile of the Seal and of the signature of any director or authorised person which may be reproduced by printing or other means on any instrument and it shall have the same force and validity as if the Seal had been affixed to such instrument and the same had been signed as hereinbefore described.

## 16. DIVIDENDS

16.1 The Company may by a resolution of directors declare and pay dividends in money, shares, or other property but dividends shall only be declared and paid out of surplus. In the event that dividends are paid in specie the directors shall have responsibility for establishing and recording in the resolution of directors authorising the dividends, a fair and proper value for the assets to be so distributed.

16.2 The directors may from time to time pay to the members such interim dividends as appear to the directors to be justified by the profits of the Company.

16.3 The directors may, before declaring any dividend, set aside out of the profits of the Company such sum as they think proper as a reserve fund, and may invest the sum so set apart as a reserve fund upon such securities as they may select.

16.4 No dividend shall be declared and paid unless the directors determine that immediately after the payment of the dividend the Company will be able to satisfy its liabilities as they become due in the ordinary course of its business and the realisable value of the assets of the Company will not be less than the sum of its total liabilities, other than deferred taxes, as shown in its books of account, and its capital. In the absence of fraud, the decision of the directors as to the realisable value of the assets of the Company is conclusive, unless a question of law is involved.

16.5 Notice of any dividend that may have been declared shall be given to each member in manner hereinafter mentioned and all dividends unclaimed for three years after having been declared may be forfeited by resolution of directors for the benefit of the Company.

16.6 No dividend shall bear interest as against the Company and no dividend shall be paid on shares described in Regulation 4.10.

16.7 A share issued as a dividend by the Company shall be treated for all purposes as having been issued for money equal to the surplus that is transferred to capital upon the issue of the share.

16.8 In the case of a dividend of authorised but unissued shares with par value, an amount equal to the aggregate par value of the shares shall be transferred from surplus to capital at the time of the distribution.

16.9 In the case of a dividend of authorised but unissued shares without par value, the amount designated by the directors shall be transferred from surplus to capital at the time of the distributions, except that the directors must designate as capital an amount that is at least equal to the amount that the shares are entitled to as a preference, if any, in the assets of the Company upon liquidation of the Company.

16.10 A division of the issued and outstanding shares of a class or series of shares into a larger number of shares of the same class or series having a proportionately smaller par value does not constitute a dividend of shares.

## 17. ACCOUNTS

The Company shall keep such accounts and records as the directors consider necessary or desirable in order to reflect the financial position of the Company.

## 18.  AUDIT

18.1  The Company may by resolution of members call for the accounts to be examined by auditors.

18.2  The first auditors shall be appointed by resolution of directors; subsequent auditors shall be appointed by a resolution of members.

18.3  The auditors may be members of the Company but no director or other officer shall be eligible to be an auditor of the Company during his continuance in office.

18.4  The remuneration of the auditors of the Company:

(1)  in the case of auditors appointed by the directors, may be fixed by resolution of directors.

(2)  subject to the foregoing, shall be fixed by resolution of members or in such manner as the Company may by resolution of members determine.

18.5  The auditors shall examine each profit and loss account and balance sheet required to be served on every member of the Company or laid before a meeting of the members of the Company and shall state in a written report whether or not

(1)  in their opinion the profit and loss account and balance sheet give a true and fair view respectively of the profit and loss for the period covered by the accounts, and of the state of affairs of the Company at the end of that period;

(2)  all the information and explanations required by the auditors have been obtained.

18.6  The report of the auditors shall be annexed to the accounts and shall be read at the meeting of members at which the accounts are laid before the Company or shall be served on the members.

18.7  Every auditor of the Company shall have a right of access at all times to the books of account and vouchers of the Company, and shall be entitled to require from the directors and officers of the Company such information and explanations as he thinks necessary for the performance of the duties of the auditors.

18.8  The auditors of the Company shall be entitled to receive notice of, and to attend any meetings of members of the Company at which the Company's profit and loss account and balance sheet are to be presented.

## 19.  NOTICES

19.1  Any notice, information or written statement to be given by the Company to members must be served in the case of members holding registered shares by mail address to each member at the address shown in the share register and in the case of members holding shares issued to bearer, in the manner provided in the Memorandum.

19.2  Any summons, notice, order, document, process, information or written statement to be served on the Company may be served by leaving it, or by sending it by registered mail addressed to the Company, at its registered office, or by leaving it with, or by sending it by registered mail to the registered agent of the Company.

19.3  Service of any summons, notice, order, document, process, information or written statement to be served on the Company may be proved by showing that the summons, notice, order, document, process, information or written statement was mailed in such time as to admit to its being delivered in the normal course of delivery within the period prescribed for service and was correctly addressed and the postage was prepaid.

## 20.  PENSION AND SUPERANNUATION FUNDS

The directors may establish and maintain or procure the establishment and maintenance of any non-contributory or contributory pension or superannuation funds for the benefit of, and give or procure the giving of donations, gratuities, pensions, allowances or emoluments to any persons who are or were at any time in the employment or service of the Company or any company which is a subsidiary of the Company or is allied to or associated with the Company or with any such subsidiary, or who are or were at any time directors or officers of the Company or of any such other company as aforesaid or who hold or held any salaried employment or office in the Company or such other company, or any persons in whose welfare the Company or any such other company as aforesaid is or has been at any time interested, and to the

wives, widows, families and dependents of any such person, and may take payments for or towards the insurance of any such persons as aforesaid, and may do any of the matters aforesaid either alone or in conjunction with any such other company as aforesaid. Subject always to the proposal being approved by resolution of members, a director holding any such employment or office shall be entitled to participate in and retain for his own benefit any such donation, gratuity, pension allowance or emolument.

### 21. ARBITRATION

21.1 Whenever any difference arises between the Company on the one hand and any of the members or their executors, administrators or assigns on the other hand, touching the true intent and construction or the incidence or consequences of these Articles or of the Ordinance, touching anything done or executed, omitted or suffered in pursuance of the Ordinance or touching any breach or alleged breach or otherwise relating to the premises or to these Articles, or to any Act or Ordinance affecting the Company or to any of the affairs of the Company such difference shall, unless the parties agree to refer the same to a single arbitrator, be referred to two arbitrators one to be chosen by each of the parties to the difference and the arbitrators shall before entering on the reference appoint an umpire.

21.2 If either party to the reference makes default in appointing an arbitrator either originally or by way of substitution (in the event that an appointed arbitrator shall die, be incapable of acting or refuse to act) for 10 days after the other party has given him notice to appoint the same, such other party may appoint an arbitrator to act in the place of the arbitrator of the defaulting party.

### 22. VOLUNTARY WINDING UP AND DISSOLUTION

The Company may voluntarily commence to wind up and dissolve by a resolution of members but if the Company has never issued shares, it may voluntarily commence to wind up and dissolve by resolution of directors.

### 23. CONTINUATION

The Company may by resolution of members or by resolution passed unanimously by all directors of the Company continue as a company incorporated under the laws of a jurisdiction outside the British Virgin Islands in the manner provided under those laws.

We, Caribbean Corporate Services Limited of P.O. Box 362, Road Town, Tortola, British Virgin Islands for the purpose of incorporating an International Business Company under the laws of the British Virgin Islands hereby subscribe our name to these Articles of Association on this 20th day of May, 1999 in the presence of the undersigned witness:-

WITNESS:                                           SUBSCRIBER:

Sgd. Grenelvia Chalwell                            Sgd. Trisha Evans

Grenelvia Chalwell                                 Trisha Evans
Witness                                            for Caribbean Corporate Services Limited
C/o P.O. Box 362                                   Subscriber
Road Town, Tortola                                 P.O. Box 362
British Virgin Islands                             Road Town, Tortola
                                                   British Virgin Islands

19

# EXHIBIT B



# THE COMPANIES ACT 1985

The Registrar of Companies for England and Wales hereby certifies that

### INTRESCO LIMITED

was incorporated under the **Companies Act 1985**

as a limited company on the **23rd December 1998**

Given at Companies House, Cardiff

the **20th July 1999**

No. 3688121

*Eira Wilson*
## EIRA WILSON
for the Registrar of Companies

Produced to me
D Brocklebury
Solicitor GILBERT SMITH & SUTCLIFFE
151 SHEEN LANE
EAST SHEEN, LONDON SW14 8LR

C 6

The Companies Acts 1985 and 1989
Company Registration Number:  3688121

# MEMORANDUM
# AND
# ARTICLES OF ASSOCIATION

## INTRESCO LIMITED

Incorporated on the 23rd day of December, 1998
Company LIMITED by Shares

EUROCOMMERCE CONSULTANTS LTD

Suite 412, Parkway House, Sheen Lane
London SW14 8LS
United Kingdom

UNITED KINGDOM OF GREAT BRITAIN AND NORTHERN IRELAND

26 JUL 1999    No. D  543370

Date ...............................

This document bears the signature/seal of

............................................ D. BROCKLESBY ...............

acting in the capacity of

Solicitor and
Commissioner for Oaths

............................................................................

J. M. A. MASON



............................................................

For Her Majesty's Principal Secretary of State
for Foreign and Commonwealth Affairs.

Companies Acts 1985 and 1989

COMPANY LIMITED BY SHARES

## MEMORANDUM OF ASSOCIATION

of

*Produced to me*
*D Brockelsby*
*Solicitor Commissioner for Oaths*

CALVERT SMITH & SUTCLIFFE
151 SHEEN LANE
EAST SHEEN, LONDON SW14 8LR
SOLICITORS

## INTRESCO LIMITED

1. The Company's name is INTRESCO LIMITED

2. The Company's Registered Office is to be situated in England & Wales.

3. The Company's objects are:

A. (i)To carry on all or any of the businesses of World wide ship and cargo brokerage, industrial chartering, international freight forwarders, project cargo services, heavy lift brokers, operational supervision, shipping agency, husbandry agency, cargo consolidate, door to door services including custom clearance, crew management and catering, tug and barge operations, shipping program services, transhipment of cargoes, brokerage in vessel purchase, cargo superintendence, survey quality inspections, repair of large tonnage ships of all types, dry cargo ships, tankers, bulkers, ro-ro ships, gas turbine ships, scientific research ships, passenger liners, berthing tugs, hydrofoil ships, repair of the main and auxiliary ship engine, turbines, ship auxiliary machinery, ship hulls and hull construction, electrical equipment, propeller equipment, outboard fittings, ship system and pipelines, ship refrigerator installation, service and living ship rooms, aids of navigation, system of ship's anticorrosive protection, hulls cleaning from fouling and rusting, phosphatizing and painting with top quality primers, self polishing coating, refrigerator installations, heat exchangers, refrigerator chambers, ship's auxiliary machinery and system, pipelines, manometic devices, repair and adjustment of diesel automatics , boilers, auxiliary machinery, radio-navigation equipment, hull and welding works, preparation of the vessel's defectation list, preparation and elaboration of repair lists.  Carrying out consulting, management, engineering and technical services in organisation, conducting and co-ordination of ship repair works on sea and river vessels, technical management of the vessels, organisation of spare partsand conventional equipment supply, carrying out project and design works on modernisation of sea and river vessels, including project and design works for improving safe navigation.  Expert estimation of correspondence of the sea and river vessels' conditions to the requirement of classification societies (Russian Maritime Register, British Lloyd, germanischer Lloyd, Bureau Veritas etc) and to the requirements of International Conventions, survey of hull and thickness measurements on all kind of vessels, diagnostic of mechanism, repair recommendations for shipowners and technical control.  Drafting of contracts, assistance in enforcement of liability claims, cargo and carrier insurance, including P&I hull and machinery, insurance claims handling, safety and pollutionprevention, contracts of affreightment, business constancy, mergers and acquisitions, restructuring of industrial and commercial enterprises, management of commercial and private investment.

(ii) To carry on all or any of the businesses of dealers in new and second-hand motor cars, motor cycles, scooters, vans, lorries, and other vehicles, and of, for, and in spares, accessories, engines, implements, tools, furnishings, and supplies of every description used or required in connection

1

therewith, proprietors of garages and petrol filling stations, repairing, hiring and other depots, motor engineers, and manufacturers, servicers, repairers, fitters, furnishers, hirers and letters on hire of, agents for motor cars and motor vehicles of all kinds, self-drive, car hire and taxi-cab service proprietors, driving instructors, mechanical, aeronautical, marine, electrical and general engineers, panel beaters, painters and sprayers, machinists, welders, and metal workers, coach and body builders, haulage and transport contractors; hire purchase agents and financiers, manufacturers of and dealers in caravans and trailers, manufacturers, merchants and factors of, agents for and dealers in electrical and mechanical goods and accessories of all kinds; and to manufacture, buy, sell and deal in plant, machinery, tools, implements, materials, commodities, substances, articles and things of all kinds, necessary or useful for carrying on the foregoing businesses or any of them, or likely to be required by customers of, or persons having dealings with the Company.

(iii) To carry on business as a general commercial Company and to carry on any trade or business whatsoever.

(iv) The Company has the power to do all such things as are incidental or conducive to the carrying on of any trade or business by it.

(v) The company has a right to establish branches, affiliates and/or subsidiary companies within the territory of the United Kingdom as well as within the territory of foreign countries.

B. To carry on any other trade or business which can, in the opinion of the Board of Directors, be advantageously carried on by the Company in connection with or as ancillary to any of the above businesses or the general business of the Company, or further any of its objects.

C. To purchase, take on lease or in exchange, hire or otherwise acquire and hold for any estate or interest any lands, buildings, easements, rights, privileges, concessions, patents, patent rights, licences, secret processes, machinery , plant, stock-in-trade, and any real or personal property of any kind for such consideration and on such terms as may be considered expedient.

D. To erect, construct, lay down, enlarge, alter and maintain any roads, railways, tramways, sidings, bridges, reservoirs, shops, stores, factories, buildings, works, plant and machinery necessary or convenient for the Company's business, and to contribute to or subsidise the erection, construction and maintenance of any of the above.

E. To borrow or raise or secure the payment of money for the purposes of or in connection with the Company's business, and for the purposes of or in connection with the borrowing or raising of money by the Company to become a member of any building society.

F. To mortgage and charge the undertaking and all or any of the real and personal property and assets, present or future, and all or any of the uncalled capital for the time being of the Company, and to issue at par or at a premium or discount, and for such consideration and with and subject to such rights, powers, privileges and conditions as may be thought fit, debentures or debenture stock, either permanent or redeemable or repayable, and collaterally or further to secure any securities of the Company by a trust deed or other assurance.

G. To issue and deposit any securities which the Company has power to issue by way of mortgage to secure any sum less than the nominal amount of such securities, and also by way of security for the performance of any contracts or any obligations of the Company or of its customers or other persons or corporations having dealings with the Company, or in whose businesses or undertakings the Company is interested, whether directly or indirectly.

2

H. To receive money on deposit or loan upon such terms as the Company may approve, and to guarantee the obligations and contracts of any person or corporation.

I. To lend and advance money or give credit on any terms and with or without security to any person, firm or company (including without prejudice to the generality of the foregoing any holding company, subsidiary or fellow subsidiary of, or any other company associated in any way with, the Company), to enter into guarantees, contracts of indemnity and surety ships of all kinds, to receive money on deposit or loan upon any terms, and to secure or guarantee in any manner and upon any terms the payment of any sum of money or the performance of any obligation by any person, firm or company including without prejudice to the generality of the foregoing any such holding company, subsidiary or associated company as aforesaid).

J. To grant pensions, allowances, gratuities and bonuses to officers, ex-officers, employees or ex-employees of the Company or its predecessors in business or the dependants or connections of such persons, to establish and maintain or concur in establishing and maintaining trusts, funds or schemes (whether contributory or non-contributory) with a view to providing pensions or other benefits for any such persons as aforesaid, their dependants or connections, and to support or subscribe to any charitable funds or institutions, the support of which may, in the opinion of the Directors, be calculated directly or indirectly to benefit the Company or its employees, and to institute or maintain any club or other establishment or profit sharing scheme calculated to advance the interests of the Company or its officers or employees.

K. To draw, make, accept, endorse, negotiate, discount, discount and execute promissory notes, bills of exchange and other negotiable instruments.

L. To invest and deal with the moneys of the Company not immediately required for the purposes of its business in or upon such investments or securities and in such manner as may from time to time be determined.

M. To pay for any property or rights acquired by the Company, either in cash or fully or partly paid-up shares, with or without preferred or deferred or special rights or restrictions in respect of dividend, repayment of capital, voting or otherwise, or by any securities which the company has power to issue, or partly in one mode and partly in another, and generally on such terms as the Company may determine.

N. To accept payment for any property or rights sold or otherwise disposed of or dealt with by the Company, either in cash, by instalments or otherwise, or in fully or partly paid-up shares of any company or corporation, with or without deferred or preferred or special rights or restrictions in respect of dividend, repayment of capital, voting or otherwise, or in debentures or mortgage debentures or debenture stock, mortgages or other securities or any company or corporation, or partly in one mode and partly in another, and generally on such terms as the Company may determine, and to hold, dispose of or otherwise deal with any shares, stock or securities so acquired.

O. To enter into any partnership or joint-purse arrangement or arrangement for sharing profits, union of interests or co-operation with any company, firm or person carrying on or proposing to carry on any business within the objects of this Company, and to acquire and hold, sell, deal with or dispose of any shares, stock or securities of any such company, and to guarantee the contracts or liabilities of, or the payment of the dividends, interest or capital of any shares, stock or securities of and to subsidise or otherwise assist any such company.

P. To establish or promote or concur in establishing or promoting any other company whose objects shall include the acquisition and taking over of all or any of the assets and liabilities of this Company or the promotion of which shall be in any manner calculated to advance directly or indirectly the objects or interests of this Company and to acquire and hold or dispose of shares,

3

stock or securities of and guarantee the payment of the dividends, interest or capital of any shares, stock or securities issued by or any other obligations of any such company.

Q.  To purchase or otherwise acquire and undertake all or any part of the business, property, assets, liabilities and transactions of any person, firm or company carrying on any business which this Company is authorised to carry on.

R.  To sell, improve, manage, develop, turn to account, exchange, let on rent, royalty, share of profits or otherwise, grant licences, easements and other rights in or over, and in any other manner deal with or dispose of the undertaking and all or any of the property and assets for the time being of the Company for such consideration as the Company may think fit.

S.  To amalgamate with any other company whose objects are to include objects similar to those of this Company, whether by sale or purchase (for fully or partly paid-up shares or otherwise) of the undertaking, subject to the liabilities of this or any such other company as aforesaid with or without winding up, or by sale or purchase (for fully or partly paid-up shares or otherwise) of all or a controlling interest in the shares or stock of this or any such company as aforesaid, or by partnership, or any arrangement of the nature of partnership, or in any other manner.

T.  To distribute among the members in specie any property of the Company, or any proceeds of sale or disposal of any property of the Company, but so that no distribution amounting to a reduction of capital be made except with the sanction (if any) for the time being required by law.

U.  To do all or any of the above things in any part of the world, and either as principals, agents, trustees, contractors or otherwise, and either alone or in conjunction with others, and either by or through agents, trustees, sub-contractors or otherwise

V.  To do all such things as are incidental or conducive to the above objects or any of them.

And it is hereby declared that in the construction of this clause the word "company" except where used in reference to the Company shall be deemed to include any person or partnership or other body of persons, whether incorporated or not incorporated,  and whether domiciled in Great Britain or elsewhere, and that the objects specified in the different paragraphs of this clause shall, except where otherwise expressed therein, be in nowise limited by reference to any other paragraph or the name of the Company, but may be carried out in as full and ample a manner and shall be construed in as wide a sense as if each of the said paragraphs defined the objects of a separate, distinct and independent company.

4.  The liability of the members is limited.

5.  The Company's share capital is £100,000 divided into 100,000 shares of £1 each.

The shares in the original or any increased capital may be divided into several classes, and there may be attached thereto respectively and preferential, deferred or other special rights, privileges, conditions or restrictions as to dividend, capital, voting or otherwise.

4

We, the subscribers to this Memorandum of Association, wish to be formed into a Company pursuant to this Memorandum; and we agree to take the number of shares shown opposite our respective names.

| Name Address and Description Of Subscribers | Number of Shares taken by each subscriber |
|---|---|
| Datadocument Limited<br>Suite 412 Parkway House<br>Sheen Lane<br>London SW14 8LS | 100 |

Total Number Of Shares To Be Taken Up          100

Dated the 4th of December, 1998

Witness to the above Signatures

Fraser White
Suite 412 Parkway House
Sheen Lane
London SW14 8LS

5

*THE COMPANIES ACTS 1985 TO 1989*

*COMPANIES LIMITED BY SHARES*

### ARTICLES OF ASSOCIATION

of

# INTRESCO LIMITED

### PRELIMINARY

1.1 In the articles of association here set forth as may be amended from time to time ("the articles") the expression "the Act" means the Companies Act 1985, and, for the purpose of the articles, Table A in The Companies (Tables A to F) Regulations 1985 S.I. No 805 or any alteration or replacement thereof ("Table A"), as statutorily in force on the date when the articles are adopted by the company named above ("the Company"), is deemed to be included in and shall be construed as one with the Act.

1.2 The Regulations contained in Table A are adopted by the Company subject to and together with the articles (such Regulations and the articles are together hereinafter called "the regulations" and deemed to be comprised within the expression "the regulations" as used in Table A)

1.3 Words and expressions used in the regulations, unless the context otherwise requires, have the same meaning as in the Act as in force at the date of the articles.

1.4 Statutory references in the articles shall include, subject as aforesaid, the statute as may be amended, extended or applied by or under any other statutory provision or as re-enacted.

1.5 The articles are deemed to be delivered and completed as a Deed at the same time as incorporation, or adoption of the articles by special resolution, of the Company as the case may be, and the members for the time being are deemed to be bound accordingly by the articles and acknowledge the effect under section14 of the Act as to the memorandum and articles of association of the Company.

### PRIVATE COMPANY

2. The Company is a private company and shall not offer any of its shares or debentures, whether for cash or otherwise, to the public or a lot or agree to a lot any shares in or debentures of the Company with a view to all or any of those shares or debentures being offered for sale to the pubic.

### CAPITAL

3. The initial share capital of the Company is £100, 000 divided into 100, 000 ordinary shares of £1 each.

6

4.    Subject to the provisions of Section 159 of the Act any Preference Shares may be issued on the terms that they are, or at the option of the Company, are liable to be redeemed.

## SHARES

5.1    The shares and any right to subscribe for, or convert nay security into, shares in the Company or any of them for the time being (other than shares shown in the memorandum of association of the Company to have been taken by the subscribers thereto or shares allotted in pursuance of an employees' share scheme) may be allotted to such persons, at such times, subject as hereinafter mentioned, in such proportions, upon such terms, except at a discount, and with such rights, including but without limitation of redemption, and restrictions, including but without limitation as to differentiation between members or calls, as the directors, subject to the articles, shall think fit. Any pre-emption rights on the allotment of shares conferred by statute from time to time are excluded pursuant to the provisions in that behalf in section 91(1) of the Act. The maximum amount of shares that may be allotted by the directors hereunder is, so long as the Company is a private company, the nominal amount of authorised but unissued share capital for the time being of the Company. The directors are authorised to exercise the power of allotment of the Company subject as aforesaid generally and unconditionally, but so that such authority will expire, except as next mentioned, on the date of the fifth anniversary of the adoption of the articles, except that:

5.1.1    thereafter the directors may exercise the said power of allotment in pursuance of an offer or agreement made by the Company before such date or in pursuance of any authority given in accordance with the Act, and

5.1.2    the directors may exercise at any time whether before or after such anniversary as aforesaid, but only so long as the Company is a private company, the said power of allotment in accordance with any elective resolution of the members.

5.2    In the event of there being only one member of the Company:

5.2.1    there shall be recorded in the register of members that there is only one member, and, as may be the case, that the number thereof is increased, and the date on which any such event occurs;

5.2.1    with whom the Company enters into a contract, other than a contract in the ordinary course of business of the Company and that member is the sole director, the Company shall ensure that the terms of the contract, unless it is in writing, are either set out in a written memorandum or recorded in the minutes of the first meeting of the directors next after making the contract;

5.2.3    that member shall provide the Company with a written record of any decisions taken thereby which have effect as if agreed by the Company in general meeting and that member shall be a quorum, and subject hereto Regulation 40 of Table A is adopted;

5.2.4    and that member ceasing for whatever reason to hold all the shares issued for the time being in the capital thereof the company secretary shall register on proof of title thereto the person or persons next entitled to any such shares on application in writing thereby subject to stamping any instrument therefore as may be required by law, and in the absence of or in default by the company secretary such person or persons aforesaid may enter the name or names thereof in the register of members, and

7

—

5.2.5    it shall not be necessary for a person, on becoming entitled to a share in consequence of the death, bankruptcy, insolvency or dissolution of the single member, to produce evidence to the directors of such entitlement before being registered as the holder of the share, and subject hereto Regulations 30 and 31 of Table A are adopted.

5.3    The Company may in accordance with an subject to Part V of the Act and all other provisions (if any) in force for the time being as to the increase, maintenance and reduction of share capital:

5.3.1    give financial assistance directly or indirectly for the purpose of acquiring any shares in the Company, or its holding company, or subsidiary company of its holding company, if any;

5.3.2    issue shares which are to be redeemed or are liable to be redeemed at the option of the Company or the holder thereof, except that no redeemable shares may be issued at any time when there are no issued shares of the Company which are not redeemable;

5.3.3    purchase its own shares including its own redeemable shares;

5.3.4    make a payment in respect of the redemption or purchase of any of its own fully-paid shares out of the distributable profits of the Company or the proceeds of a fresh issue of shares or, so long as the Company is a private company, out of capital, or, so long as aforesaid, partly out of one and partly out of the other, and as to redemption on such date or dates (to be fixed prior to the issue of such shares) and terms and in such manner as may be determined at any time or times by the directors but so that the amount to be paid on redemption shall be the paid-up amount thereof plus the net amount of any arrears of dividends thereon

5.4    Provided always that any shares purchased or redeemed by the Company shall be treated as cancelled.

5.2    The certificate or warrant of any security issued or granted be defaced, lost, worn-out or destroyed may be renewed on payment of a fee on such terms as to evidence and indemnity, and the payment of all expenses of the Company of investigating evidence, as the directors shall think fit, and on the return to the Company of any certificate or warrant to be renewed which is defaced or worn-out as the case may be.

5.3    The directors may in their absolute discretion, and without assigning any reason therefore, decline to register any transfer or any renunciation of any share whether or not it is a fully-paid share subject as hereinafter may be mentioned Provided always that the transferee of any fully paid share need not execute whether under seal or under hand the instrument of transfer, and subject hereto Regulations 23 and 24 of Table A are adopted.

5.7    The Company, if the directors think fit and subject to such terms and conditions (if any) as to requisition of, or submitting any resolution to, or attending and voting at any meeting and as to any other matter as they may from time to time decide, may:

5.7.1    issue under its common seal a warrant with respect to any fully paid shares stating that the bearer of the warrant is entitled to the shares therein specified, and

5.7.2    provide by coupons or otherwise for the payment of future dividends on the shares included in the warrant provided always that the shares specified as aforesaid may be transferred by delivery of the warrant,

8

5.7.3    Provided the holder of any such warrant may surrender the same at any time for cancellation and thereupon the name thereof shall be entered in the register of members, and the bearer of any share warrant issued by the Company shall be deemed to be a member of the Company subject as aforesaid to the full extent. A new warrant shall not be issued to replace one that has been lost unless the directors are satisfied beyond reasonable doubt that the original has been destroyed.

5.8     The Company may accept from any member the whole or any part of the amount remaining unpaid on any shares held by that member, although no part of that amount has been called up. The liability of any member in default in respect of a call shall be increased by interest payable at such rate without limit as the directors may determine on any amount called and by the addition of all costs, charges and expenses that may have been incurred by the Company by reason of such non-payment, and subject hereto Regulation 18 of Table A is adopted.

## MEMBERS

6.1     Regulation 37 of Table A is adopted with "28 days" substituted for "eight weeks", and Regulation 41 of Table A is adopted with the addition at the end thereof of the words "and if at the adjourned meeting a quorum is not present within 15 minutes from the time appointed for the meeting or if during the meeting a quorum ceases to be present the member or members present entitled to be counted in a quorum shall be a quorum" subject as hereinafter may be mentioned, and Regulation 54 of Table A is adopted with the addition of the words "on any resolution whatsoever including but without limitation any resolutions as to a voluntary arrangement under Part 1 of the Insolvency Act 1986" after the words "on a poll", and the second sentence in Regulation 49 of Table A shall not apply, and Regulations 56 and 62(a) of Table A are adopted with "24" substituted respectively for "48" and the Company may dispense by elective resolution with the holding of annual general meetings.

6.2     Any resolution may be proposed and passed as special, extraordinary, ordinary or otherwise notwithstanding that the Company has given less than 21 or 14 days' notice thereof, or of the meeting or adjourned meeting at which it is proposed to be passed, as the case may be, if it is so agreed by a majority in number of the members having a right to attend and vote on the resolution together holding not less than 95% (subject to any elective resolution reducing that amount to not less than 90%) in nominal value of the shares giving that right, and subject hereto Regulation 38 of Table A is adopted.

## VOTES OF MEMBERS

7.     Subject to any rights or restrictions for the time being attached t any class or classes of shares, on a show of hands every member present in person shall have one vote, and on a poll every member shall have one vote for each share of which he is the holder.

## DIRECTORS

8.1     The number of the directors may be fixed by the Company, but unless and until so fixed there shall be no maximum and the minimum number shall be one. The continuing directors or a sole continuing director may act notwithstanding any vacancies in the number thereof required by the articles, and in the event of only one person holding office as director in accordance with the regulations that person shall be deemed to constitute a quorum and have full authority to exercise all the powers and discretions by the articles expressed to be vested in the directors, and Regulations 64 and 90 of Table A are not adopted, and subject hereto and as hereinafter mentions Regulations 40 and 89 of Table A is adopted.

9

8.2    The directors need not retire by rotation. Regulations 73 to 78 of Table A are not adopted, and, subject to the articles, Regulation 79 of Table A except the words "and shall not be taken into account in determining the directors who are to retire by rotation at the meeting" is adopted. The Company may be ordinary resolution appoint a person who is willing to be a director either to fill a casual vacancy or as an additional director.

8.3    Each director shall have power from time to time to nominate another director or any person not being a director approved by the other directors, to act as the alternate thereof, and at the discretion of such director to remove such alternate director, save that a person not being a director is appointed as an alternate shall not appoint an alternate, and each alternate director:

8.3.1    shall be subject to all the terms and conditions existing with reference to the other directors except as to power to appoint an alternate director and remuneration, and subject to giving the Company an address at which notices may be served thereon, shall be entitled to receive notice of all meetings of the directors and shareholders and to attend, speak and vote at any such meeting at which the appointor thereof is entitled to be, but is not, present;

8.3.2    may act as alternate director to more than one director, and while so acting such person shall be entitled to a separate vote for each director thereby represented, and if any such alternate is a director the vote or votes thereof as an alternate director shall be in addition to the vote thereof as a director;

8.3.3    may be appointed or removed as an alternate director by letter, telex, facsimile transmission or in any other manner approved by the directors. Any telex or facsimile transmission shall be confirmed as soon as possible by letter but meanwhile may be acted upon by the Company;

8.3.4    appointed by any person ceasing to hold office as director shall cease simultaneously to have any power or authority to act as an alternate director provided always that any person who is an alternate director at a meeting when the appointor thereof ceases to be a director shall be deemed to be reappointed as an alternate director if at that meeting such appointer is reappointed or deemed to be reappointed as a director unless the contrary is expressed in writing by such appointer;

8.3.5    shall during the appointment thereof be an officer of the company and shall not be deemed to be an agent of the appointer thereof and a director shall not be liable for the acts and defaults of any alternate director appointed thereby;

8.3.6    shall not be taken into account in reckoning the minimum number of directors allowed for the time being, but shall be counted for the purpose of reckoning whether a quorum is present at any meeting of the directors attended thereby at which such alternate director is entitled to vote, and

8.3.7    shall not be entitled any emoluments from the Company in respect of being an alternate director Provided always that the Company may pay all travelling, hotel and other expenses properly incurred by such alternate director in attending and returning from meetings of the directors or any committee of the directors or general meetings of the Company or in connection with the business of the Company.

8.4    Subject to any written agreement between the members, the directors may receive such emoluments (whether by way of Fees, salary, commission, participation in profits, or partly in one way and partly in another or otherwise) as shall from time to time be determined by the Company in general meeting, and any managing director may receive such emoluments determined as aforesaid and Regulation 82 of Table A is adopted as if it applied to all such emoluments as aforesaid, and Regulation 84 of Table A is adopted except the last sentence.

10

8.5     The directors may retain any benefits received by them or any of them by reason of the exercise of any powers in Clause 3 in its entirety of the memorandum of association, and subject hereto Regulation 87 of Table A is adopted.

8.6     The directors shall be reimbursed by the Company for all expenses incurred properly by them in the discharge of their duties in addition to any expenses payable under Regulation 83 of Table A, and in addition the Company shall repay, as the directors think fit, all costs, expenses and disbursements of or in connection with legal advice and without limitation other advice obtained in connection with the affairs of the Company.

8.7     The directors may exercise all the powers of the Company, and without prejudice to the generality thereof shall have power to:

8.7.1   borrow without limit and to issue any securities subject to section 80 of the Act and to the articles, and

8.7.2   execute under the signature of any two of them or any one of them and the company secretary and deliver any document so as to have the same effect as a deed as in any such case they may think fit, and the Company need not have a common seal, and subject hereto Regulations 6 and 101 of Table A are adopted.

8.8     Notice of any meeting of the directors may be given by telephone.  The contemporaneous linking together by telephone of a number of the directors being not less than the quorum and the company secretary shall be deemed to constitute a meeting of the directors wherever in the world they are, so long as:

8.8.1   none of the directors is absent from the meeting except only as to any of them who the chairman may have consented before the meeting may be absent therefrom;

8.8.2   the directors who are present at the meeting constitute a quorum;

8.8.3   at the commencement of the meeting each director acknowledges the presence thereof to all the other directors taking part;

8.8.4   each of the directors taking part and the company secretary are able to hear each other of them subject as hereinafter mentioned throughout the meeting;

8.8.5   the directors present at the commencement of the meeting do not leave the meeting by disconnecting the telephone, but the meeting shall be deemed to have been conducted validly notwithstanding that the telephone of any director is accidentally disconnected during the meeting and the proceedings thereof shall be deemed to be as valid as if the telephone had not been disconnected.

8.8.6   and a minute of the proceedings shall be sufficient thereof and of the observance of all necessary formalities if certified by both the chairman and the company secretary.

8.9     A director may vote as a director in regard to any contract or arrangement in which that director is interested or upon any matter arising thereout Provided always that such interest is first disclosed to the directors, and such vote shall be counted and such director shall be counted in the quorum present at the meeting when any such contract or arrangement is under consideration, and subject hereto Regulations 85 and 89 of Table A are adopted.

11

8.10  The directors shall cause minutes to be made for the purposes of section 382 of the Act, which, together with all registers, records or other information statutorily or otherwise required to be registered or recorded by the Company, may be recorded in bound books or some other means as the directors may determine so long as the recording is capable of being reproduced in legible form and adequate precautions are taken for guarding against falsification Provided always that the directors need not sign their names for the purpose of recording their attendance at any meeting.

8.11  Subject to section 310 of the Act and whether or not in connection with any application under section 144 or 727 of the Act or otherwise, every director or other officer of the Company shall be indemnified out of the assets of the Company against all losses and liabilities, and the directors and other officers shall not be liable for any loss, damage or misfortune which may happen to or be incurred for the Company in the execution of their duties to the Company, and the Company may purchase and maintain insurance against liability relating to the Company in respect of any negligence, default, breach of duty and breach of trust attaching to any officer or auditor of the Company for the time being Provided always that the directors shall state the existence of any such insurance in their report for each financial year, and subject hereto Regulation 118 of Table A is adopted.

## DISTRIBUTIONS

9     Any dividends resolved to be recommended, declared or paid, any sum resolved to be capitalised and the assets of the Company to be divided on a winding up shall be paid or distributed, subject to the articles and the rights attaching to the shares, in proportion t the nominal amount of the shares (whether or not fully paid) held by the members entitled thereto Provided always that if any share is issued on terms that it shall rank for dividend as from a particular date, that share shall rank for dividend accordingly and Regulation 104 of Table A is not adopted.

12

Name Address and Description
Of Subscribers

Datadocument Limited
Suite 412 Parkway House
Sheen Lane
London Sw14 8LS

Dated the 4th of December, 1998

Witness to the above Signatures:

Fraser White
Suite 412 Parkway House
Sheen Lane
London  SW14 8LS

13

# EXHIBIT C

# Time Charter

GOVERNMENT FORM
Approved by the New York Produce Exchange
November 6th, 1913-Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946

1   **This Charter Party,** made and concluded in _____ Piraeus__ _5th_ ___ day of _____ December 2007___

2   Between Messrs "DOMINA SHIPMANAGEMENT LTD"

3   Owners of the good ____ Liberian flag _____ (Steamship/Motorship) ___ M/V " SEAGREETING " ___ of _____

4   of __25,965__ tons gross register, and ____13,129___ tons net register, having engines of _____ indicated horse power

5   and with hull, machinery and equipment in a thoroughly efficient state, and classed _____

6   at _____ of about _____ cubic feet bale capacity, and about ___43,461 metric___ tons of 2240lbs.

7   deadweight capacity (cargo and bunkers, including fresh water and stores not exceeding one and one-half percent of ship's deadweight capacity,

8   allowing a minimum of fifty tons) on a draft of _11,705 meters_ feet ___ inches on __ salt_ Summer freeboard, inclusive of permanent bunkers,

9   which are of the capacity of about _____ tons of fuel, and capable of steaming fully laden, under good weather

10  conditions about _____ knots on a consumption of about _____ tons of best Welsh coal best grade fuel oil best grade Diesel oil,

11  now _trading_

12  and _Messrs "MEDWAY CHARTERING BAHAMAS"_ _performance guarranteed by Messrs INTRESCO LIMITED UK_
    Charterers of the City of ___ .

13  **Witnesseth,** That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for

14  about _2-3 Laden legs via safe port(s), safe berth(s), safe anchorage(s), always afloat, always accessible, always within Institute Warranty_
    _Limits, with lawful bulk cargoes (Intention first leg BHF). Duration about 50-90 days without guarantee._

15  _____ within below mentioned trading limits.

16  Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining responsible for

17  the fulfillment of this Charter Party. _Acceptance of delivery by Charterers shall not constitute any waiver of Owners' obligations hereunder._

18  Vessel to be placed at the disposal of the Charterers, at _on dropping last outward sea pilot Piraeus, at any time, day or night, Sundays and_
    _Holidays included._

19  _____

20  in such dock or at such wharf or place (where she may safely lie, always afloat, at all times of tide, except as otherwise provided in Clause No.6), as

21  the Charterers may direct. If such dock, wharf or place be not available time to count as provided for in Clause No.5. Vessel on her delivery to be

22  ready to receive cargo with clean swept holds and tight, staunch, strong and in every way fitted for _ordinary cargo (as permitted under this_
    _Charter Party)_ service and so be maintained by the Owners throughout the currency of this Charter Party the service, having water ballast,
    winches and

23  donkey boiler with sufficient steam power, or if not equipped with donkey boiler, then other power sufficient to run all the _cranes_ winches at one and the
    same

24  time (and with full complement of officers, seamen, engineers and firemen for a vessel of her tonnage), to be employed, in carrying lawful

25  merchandise, including petroleum or its products, in proper containers, excluding _See Clause 50_

26  (vessel is not to be employed in the carriage of Live Stock, but Charterers are to have the privilege of shipping a small number on deck at their risk.

27  all necessary fittings and other requirements to be for account of Charterers), in such lawful trades, between safe port and/or ports in British North

28  America, and/or United States of America, and/or West Indies, and/or Central America, and/or Caribbean Sea, and/or Gulf of Mexico, and/or

29  Mexico, and/or South America _____ and/or Europe

30  and/or Africa, and/or Asia, and/or Australia, and/or Tasmania, and/or New Zealand, but excluding Magdalena River, River, St. Lawrence between

31  October 31st and May 15th, Hudson Bay and all unsafe ports: also excluding, when out of season, White Sea, Black Sea and the Baltic,

32  _____

33  _____

34  _____

35  as the Charterers or their Agents shall direct, on the following conditions:

36  1. That the Owners shall provide and pay for all provisions, wages and consular shipping and discharging fees of the Crew; _also all consular_
    _fees necessitated because of vessel's nationality or in respect of Owners business, also all garbage removal by Master provided local_
    _authorities permit_ shall pay for the

37  insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, including boiler water and maintain her class and keep

38   the vessel in a thoroughly efficient state in hull, machinery and equipment for and during the service.

39        2. That *whilst on hire* the Charterers shall provide and pay for all the fuel except as otherwise agreed, Port Charges, *customary and recommended including Skaw/Suez, Sound/Great Belt, Bosporus/Dardanelles* Pilotages, *Japanese/Chinese inland sea pilotages,*Agencies, Commissions,

40   Consular Charges (except those pertaining to the Crew *and Vessel*), and all other usual expenses except those before stated, but when the vessel puts into

41   a port for causes for which vessel is responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered because of

42   illness of the crew to be for Owners account.  Fumigations ordered because of cargoes carried or ports visited while vessel is employed under this

43   charter to be for Charterers account. All other fumigations to be for Charterers account after vessel has been on charter for a continuous period

44   of six months of more.

45        Charterers are to provide necessary dunnage and shifting boards, also any extra fittings requisite for a special trade or unusual cargo, but

46   Owners to allow them the use of any dunnage and shifting boards already aboard vessel. Charterers to have the privilege of using shifting boards

47   for dunnage, they making good any damage thereto.

48        3. ~~That the Charterers, at the port of delivery, and the Owners, at the port of re-delivery, shall take over and pay for all fuel remaining on~~

49   ~~board the vessel at the current prices in the respective ports, the vessel to be delivered with not less than~~............~~tons and not more than~~

50   ............~~tons and to be re-delivered with not less than~~........~~tons and not more than~~.......~~tons.~~      See Clause 37

51   4. That the Charterers shall pay for the use and hire of the said Vessel at the rate of .......*USD 55,250 per day or pro rata including overtime*

52   *payable every 15 days in advance to Owners' nominated bank.* United States Currency ~~per ton on vessel's total deadweight carrying capacity,~~
     ~~including bunkers and~~

53   ~~stores, on~~..........................~~summer freeboard, per Calendar Month,~~ commencing on and from the day of her delivery, as aforesaid, and at

54   and after the same rate for any part of a month; hire to continue until the hour of the day of her re-delivery in like good order and condition, ordinary

55   wear and tear excepted, to the Owners (unless lost) at *on dropping last outward sea pilot Skaw/Gibraltar range including Mediterranean/Black*

56   *Sea, excluding Baltic or Charterers option 1 safe port Singapore/Japan range, at any time day or night, Sundays and Holidays included*
     unless otherwise mutually agreed. Charterers are to give Owners not less than *15/10* days

57   *approximate and 5/3/2/1 days definite* notice of vessel's expected date of re-delivery, and probable port.

58        5. Payment of said hire to be made in New York *(See Clause 53)* in cash in United States Currency, *every 15 days* ~~semi-monthly~~ in advance,
     *Charterers have the right to withhold from hires an undisputed off-hire hereunder and from last payment of hire estimated Owner's
     disbursements up to maximum US$ 500 per port,* and for the last *15 days* ~~half month~~ or

59   part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it becomes

60   due, if so required by Owners, unless bank guarantee or deposit is made by the Charterers, otherwise failing the punctual and regular payment of the

61   hire, or bank guarantee, or on any breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service of the Char-

62   terers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers. ~~Time to count from 7 a.m. on the working day~~

63   ~~following that on which written notice of readiness has been given to Charterers or their agents before 4 p.m ., but if required by charterers, they~~

64   ~~to have the privilege of using vessel at once, such time used to count as hire.~~

65        Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain, by the Charterers or their agents, subject

66   to 2½% commission and such advances shall be deducted from the hire.  The Charterers, however, shall in no way be responsible for the application

67   of such advances.

68        6. That the cargo or cargoes be laden and/or discharged in any *safe* dock or at any *safe* wharf or *safe* place that Charterers or their Agents may

69   direct, provided the vessel can safely lie always afloat at any time of tide, ~~except at such places where it is customary for similar size vessels to safely~~

70   ~~lie aground.~~ *via safe ports, safe berths, safe anchorages, always afloat, always excepting, always within International Warranty Limits.*

71   7. *See Clause 74* That the whole reach of the Vessel's Hold, Decks, and usual places of loading (not more than she can reasonably stow and
     carry), also

72   accommodations for Supercargo, if carried, shall be at the Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew,

73   tackle, apparel, furniture, provisions, stores and fuel. ~~Charterers have the privilege of passengers as far as accommodations allow, Charterers~~

74   ~~paying Owners~~...............~~per day per passenger for accommodations and meals.  However, it is agreed that in case any fines or extra expenses are~~

75   ~~incurred in the consequence of the carriage of passengers, Charterers are to bear such risk and expense.~~

76        8. That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew and

77   boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and

78   agency; and Charterers are to load, stow, ~~and~~ trim, *and discharge* the cargo at their expense under the supervision of the Captain, who is to sign
     Bills of Lading for

79   cargo as presented, in conformity with Mate's ~~or Tally Clerk's~~ receipts.

80  9. That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on
81  receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments *but this provision does not*
*affect the right of the Charterers to advance any claim or require arbitration of any dispute regarding the conduct of the Master in the*
*prosecution of this voyage and in carrying out the orders and directions of the Charterers..*
82  10. That *provided accommodation and lift boat capacity permits,* the Charterers shall have permission to appoint a Supercargo *(Charterers*
*completing Owners required LOI),* who shall accompany the vessel and see that voyages are prosecuted
83  with the utmost despatch.  He is to be furnished with free accommodation, and same fare as provided for Captain's table, Charterers paying at the
84  rate of *US$ 15.00* $1.00 per day.  Owners to victual pilots and Customs Officers, and also, when authorized by Charterers or their Agents, to
victual Tally
85  Clerks, Stevedore's Foreman, etc, Charterers paying *(See Clause 58)* at the current rate per meal, for all such victualling.
86  11. That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, and the
87  Captain shall keep a full and correct Log of the voyage or voyages, which are to be patent to the Charterers or their agents, and furnish the Char-
88  terers, their Agents or supercargo, when required, with a true copy of daily *official deck and engine* Logs, showing the course of the vessel and
distance run and the con-
89  sumption of fuel.
90  12. That the Captain shall use diligence in caring for the ventilation of the cargo.
91  13. That the Charterers shall have the option of continuing this charter for a further period of ........................................................
92  ..........................................................................................................................................................
93  on giving written notice thereof to the Owners or their Agents ............ days previous to the expiration of the first-named term, or any declared option
94  14. That if required by Charterers, time not to commence before............ *7th December 2007, 0001hrs* ............and should vessel
95  not have *been delivered* given written notice of readiness on or before.... *10th December 2007, 2359 hrs....* but not later than 4 p.m.  Charterers or
96  their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness.
97  15. That in the event of the loss of time *or arising or resulting from any strike or work stoppage by or against the vessels Master, Officers or*
*seamen, whether partial or general from deficiency or default of crewmen or lock out of crewmen, sickness of crewmen, accidents to any of*
*the crew, deficiency or defect in stores, fire, breakdown, deterioration* from deficiency of men or stores, fire, breakdown *or damages to hull,*
machinery or equipment,
98  grounding, detention by average accidents to ship or cargo, drydocking for the purpose of examination or painting bottom, or by any other cause
99  preventing the full working of the vessel, the payment of hire shall cease for the time thereby lost; and if upon the voyage the speed be reduced by
100 defect in or breakdown of any part of her full, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence
101 thereof, and all *directly related* extra expenses shall be deducted from the hire.  *See Clause 41.*
102 16. That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be
103 returned to the Charterers at once.  The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas,
104 Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.
105 The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the
106 purpose of saving life and property. *See Clause 40.*
107 17. That should and dispute arise between Owners and the Charterers, the matter in dispute shall be referred to three Persons at New York,
108 one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them, shall be final, and for
109 the purpose of enforcing any award, this agreement may be made a rule of the Court.  The Arbitrators shall be commercial men. *See Clause 67.*
110 18. That the Owners shall have a lien upon all cargoes, and all sub-freights for any amounts due under this charter, including General Aver-
111 age contributions, and the Charterers to have a lien on the ship for all monies paid in advance and not earned, and any overpaid hire or excess
112 deposit to be returned at once.  Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which
113 might have priority over the title and interest of the owners in the vessel. *English Law to apply. See also Clause 67.*
114 19. That all derelicts and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and
115 Crew's proportion.  General average shall be adjusted, stated and settled according to Rules 1 to 15, inclusive, 17 to 22, inclusive, and Rule F of
116 York-Antwerp Rules *1974, as amended 1990 in London and any amendments thereto* 1924, at such port or place in *London* the United States
as may be selected by the *Owners and Charterers by mutual agreement, Owners respecting sub-contracts stipulation as long as confirmed to*
*London* carrier, and as to matters not provided for by the
117 Rules, according to the laws and usages at the port of New York.  In such adjustment disbursements in foreign currencies shall be exchanged into
118 United States money at the rate prevailing on the dates made and allowances for damage to cargo claimed in foreign currency shall be converted at
119 the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship.  Average agreement or
120 bond and such additional security, as may be required by the carrier, must be furnished before delivery of the goods.  Such cash deposit as the carrier

121 or his agents may deem sufficient as additional security for the contribution of the goods and for any salvage and special charges thereon, shall, if
122 required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery. Such deposit shall, at the option of the
123 carrier, be payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held in a special account a the
124 place of adjustment in the name of the adjuster pending settlement of the General Average and refunds or credit balances, if any, shall be paid in
125 United States money. *Hire not to contribute to General Average.*

126 ~~In the event of accident, danger, damage, or disaster, before or after commencement of the voyage resulting from any cause whatsoever,~~
127 ~~whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract, or otherwise, the~~
128 ~~goods, the shipper and the consignee, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifices,~~
129 ~~losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the~~
130 ~~goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same manner as if such salving ship or~~
131 ~~ships belonged to strangers.~~

132 Provisions as to General Average in accordance with the above are to be included in all bills of lading issued hereunder.

133 20. Fuel used by the vessel while off hire, ~~also for cooking, condensing water, or for grates and stoves~~ to be agreed to as to quantity and the
134 cost of replacing same, to be allowed by Owners.

135 21. That as the vessel may be from time to time employed in tropical waters during the term of this Charter, Vessel is to be docked at a
136 convenient place, bottom cleaned and painted whenever Charterers and Captain think necessary, at least once in every six months, reckoning from
137 time of last painting, and payment of the hire to be suspended until she is again in proper state for the service.
138 *Vessel is not to drydock during the currency of this Charter Party except in case of emergency* .............................................
139 ............................................................................................................................................................;

140 22. Owners shall maintain the gear of the ship as fitted, providing gear (for all derricks) capable of handling lifts up to three tons, also
141 providing ropes, falls, slings and blocks *as on board.* ~~If vessel is fitted with derricks capable of handling heavier lifts, Owners are to provide necessary gear for~~
142 ~~same, otherwise equipment and gear for heavier lifts shall be for Charterers' account. Owners also to provide on the vessel lanterns and oil for~~
143 ~~night work, and vessel to give use of electric light when so fitted, but any additional lights over those on board to be at Charterers' expense. The~~
144 ~~Charterers to have the use of any gear on board the vessel.~~ *See Clause 41.*

145 23. *All cranemen to be employed and paid for by Charterers* ~~Vessel to work night and day, if required by Charterers, and all winches to be at Charterers' disposal during loading and discharging;~~
146 ~~steamer to provide one winchmen per hatch to work winches day and night, as required, Charters agreeing to pay officers, engineers, winchmen,~~
147 ~~deck hands and donkeymen for overtime work done in accordance with the working hours and rates stated in the ship's articles. If the rules of the~~
148 ~~port, or labor unions, prevent crew from driving winches, shore Winchmen to be paid by Charterers. In the event of a disabled winch or winches or~~
149 ~~insufficient power to operate winches, Owners to pay for shore engine, or engines, in lieu thereof, if required, and pay any loss of time occasioned~~
150 ~~thereby.~~

151 24. ~~It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained~~
152 ~~in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels,~~
153 ~~etc.," in respect of all cargo shipped under this charter to or from United States of America. It is further subject to the following clauses, both~~
154 ~~of which are to be included in all bills of lading issued hereunder:~~

155 ~~U.S.A. Clause Paramount~~

156 ~~This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April~~
157 ~~16,1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of~~
158 ~~any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading~~
159 ~~be repugnant to said Act to any extent, such term shall be void to that extent, but no further.~~

160 ~~Both to Blame Collision Clause~~

161 ~~If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the~~
162 ~~Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried~~
163 ~~hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss~~
164 ~~or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-~~
165 ~~carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the other or non-carrying ship or her~~
166 ~~owners as part of their claim against the carrying ship or carrier.~~

167 25. The vessel shall not be required to enter any ice-bound port, or any port where lights or light-ships have been or are about to be with-
168 drawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter the
169 port or to get out after having completed loading or discharging. *Vessel not to force ice or follow ice-breaker. In the case that vessel is*

*restricted to sail after completion of loading or discharge from a port that formation of ice occurred after vessel's arrival and where same could not been forseen, then vessel to only follow ice breaker at Masters discretion/approval and if any damages occures to the vessel same to be repaired by Charterers at Masters/Owners representative approval.*

170    26. Nothing herein states is to be construed as a demise of the vessel to the Time Charterers.  The owners to remain responsible for the
171    navigation of the vessel, *act of pilots or tugboats*, insurance, crew, and all other matters, same as when trading for their own account.

172    27. A commission of 2 1/2 *1,25* per cent is payable by the Vessel and Owners to_____*Ocean Breeze Chartering S.A.*_____:
173    .................................................................................................................................................................................................................................................
174    on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.

175    28. An address commission of 2 1/2 *2,5*  per cent payable to.......*Charterers*.........on the hire earned and paid under this Charter.

*Clause 29 – 89 both inclusive as attached hereto, are deemed to be fully incorporated in this Charter Party.*


**THE  OWNERS:**                                    **THE CHARTERERS:**


This Charter Party is a computer generated copy of the NYPE (Revised 3rd October, 1946) form printed under license from the Association of Ship Brokers & Agents (U.S.A.) , Inc., using software which is the copyright of Strategic Software Limited.

It is a precise copy of the original document which can be modified, amended or added to only by the striking out of original characters, or the insertion of new characters, such characters being clearly highlighted by underlining or use of colour or use of a larger font and marked as having been made by the licensee or end user as appropriate and not by the author.

<u>RIDER CLAUSES TO M/V "SEAGREETING" CHARTER</u>
<u>PARTY DATED 5TH DECEMBER, 2007</u>

**Clause 29 :**
Bunker survey to establish quantity of bunkers on board to be held in Charterers' time at first
load port and in Owners' time at last discharge port, but only time lost to be deducted from
hire. Cost of surveys to be shared equally between Owners and Charterers. Owners option to
use Master or chief engineer on their behalf for on/off hire survey thus not contributing to
survey expenses.

**Clause 30 :  Vessel's Description**

```
MV 'Seagreeting'
----------------
Liberian flag
single deck bulk carrier - built 11/1987 - Tsuneishi
43,461 mt on 11.705 m ssw - tpc 51
Loa/beam 185.84 m / 30.5 m
Depth moulted 16.2 m
airdraft laden/ballast 35,71/41,40
keel to top mast 47,42m
Int GRT/NRT  25,865 / 13.129 mt
Suez grt/nrt  26,685 / 23,201 mt
7 ho/7 ha
grain capacity 48,166 cbm (same bale)
4 cranes x 25 ts swl
b+w engine 6160mc (mitsui) 9.680 bhp
speed on consumption:
abt 12.5 knot(AV) on 27 mts ifo (380cst) plus 1,5 mts mdo at sea
basis upto and including beaufort 4
port cons bss idle/wrkg 8hrs, 24 hrs respectively
-idle  2.5mt ifo + 1.5mt mdo
-wrkg 4 cranes 24hrs    4.0mt ifo + 3.0mt mdo
-wrkg 4 cranes 8hrs     3.0mt ifo + 2.0mt mdo
Breakdown holdwise cubic grain/bale - all in cbm
1) 6.154,5 - 2) 7.104,2 - 3) 7.160,5 - 4) 7.129,4
5) 7.153,8 - 6) 7.122,9 - 7) 6.340,7
strength of tanktop/deck/h.cover (mt/m2)
tanktop:  no 1 - 21,8  nos 2,4,6 - 19,3
          nos 3,5 - 26,0  -  no 7- 24,4
deck: 3,3 hatchcovers: 2,8
hatchcover type/hatch size
piggy back covers/ all 12,745 x 15,27m
hold dims (longitudinal between corrugated bulkhead/breadth
between inner sideshell/height)/hold flat tanktop dimensions
(fwd/mid/aft breadth and length per hold respectively)
```

|        |       |       | without | hatchcoaming | height(m) |
|--------|-------|-------|---------|--------------|-----------|
| hold dimensions: (m) | | | | | |
| i      | 19.2  | 16.8  | 24.6    | 22.7         | 14.8      |
| ii     | 18.4  | 26.6  | 28.6    | 27.6         | 14.8      |
| iii    | 18.4  | 28.6  | 28.6    | 28.6         | 14.8      |
| iv     | 18.4  | 28.6  | 28.6    | 28.6         | 14.8      |
| v      | 18.4  | 28.6  | 28.6    | 28.6         | 14.8      |
| vi     | 18.4  | 28.6  | 28.6    | 28.6         | 14.8      |
| vii    | 18.4  | 27.2  | 21.0    | 24.1         | 14.8      |

```
hatchcoamings all 7 hatches: l=12.74m b=15.27m h=2.0m
tanktop dimensions (m)
```

|   | lenght | breadth fwd | breadth aft | breadth mid |
|---|--------|-------------|-------------|-------------|
| i | 19.2   | 12.3        | 22.6        | 17.4        |

**RIDER CLAUSES TO M/V "SEAGREETING" CHARTER
PARTY DATED 5TH DECEMBER, 2007**

| | | | | |
|---|---|---|---|---|
| ii | 18.4 | 22.6 | 23.9 | 23.2 |
| iii | 18.4 | 23.9 | 23.9 | 23.9 |
| iv | 18.4 | 23.9 | 23.9 | 23.9 |
| v | 18.4 | 23.9 | 23.9 | 23.9 |
| vi | 18.4 | 23.9 | 23.9 | 23.9 |
| vii | 18.4 | 23.9 | 13.6 | 18.7 |

all details abt

**Clause 31 :**
Deleted.


**Clause 32 :  Certificates**
Throughout the period of the charter vessel will have on board all necessary certificates to enable the vessel and her crew to carry the cargoes and trade within the trading limits allowed under this charter.


**Clause 33 :  Pollution**
(A) If the Owners are required to establish or maintain financial security or responsibility in respect of oil or other pollution damage to enable vessel lawfully to enter, remain in or leave any port, place, territorial or contiguous waters of any country or state in performance of this Charter Party, the Owners shall make all arrangements by bond or otherwise as may be necessary to satisfy such requirements at the Owners' sole expense.

(B) The Charterers shall be under no responsibility for all consequences (including loss of time) of oil or other pollution damage and any failure or inability of the Owners to do so as provided for above and any loss of time incurred thereby to be off-hire, unless this pollution arose by reason of Charterers' negligence and/or default.

(C) The Owners shall indemnify the Charterers harmless against all consequences (including fines if any imposed to Charterers) of oil or other pollution damage and any failure or inability of the Owners to do so as provided for in preceding paragraph (A).

(D) Deleted.

(E) Notwithstanding the above, if any, additional expenses are required to be incurred for compliance with this clause arising out of law, regulations, rules etc. coming into force after the date of Charter Party, the said expenses, to be on Charterers' account.

Owners warrant they maintain usual P & I cover in respect of oil pollution up to US$ 500 million per accident and further reiterate they remain responsible for providing COFRS required under present U.S. law.

Owners not to be held responsible if such cover is not available from the International Group of P & I clubs.


**Clause 34 :  Blacklisted**
The Owners warrant that the vessel is not blacklisted by the Arab or other countries within the agreed trading limits.

**RIDER CLAUSES TO M/V "SEAGREETING" CHARTER
PARTY DATED 5TH DECEMBER, 2007**

**Clause 35 :  War**
Annual War Risk Insurance Premium to be for Owners' account, but any increase or additional premium, levied by Owners' underwriters, to be for Charterers' account. In the event of war breaking out between any two or more of the following countries:

USA, Canada, China, C.I.S., United Kingdom, both parties to have the option of cancelling this Charter Party, provided cargo not already on board.

All extra insurance/premium invoices to be supported by Underwriter's/Underwriter's agents' original vouchers and Charterers are entitled to usual rebates.

Any extra war risk insurance including blocking and trapping and crew war bonus to be for Charterers account.

**Clause 36 :  Quarantine**
Normal quarantine time and expenses for entering ports for Charterers' account but any time of detention and expenses for quarantine due to pestilence, illness etc., of the vessel's Master, Officers and crew to be for Owners' account, as long as the vessel remains within her trading limits under the present Charter Party.

Owners to arrange at their expense that the Master, Officers and crew of the vessel hold valid vaccination certificates against yellow fever and smallpox, if required upon delivery of the vessel and throughout the timecharter period.

**Clause 37 :  Bunkers**

Charterers to pay bunkers on delivery together with first hire payment. Bunkers on delivery about 870 metric tons IFO and about 80 metric tons MGO.

Vessel to be redelivered with about the same quantities of bunkers as on delivery. Bunker prices US$ 460 per metric ton IFO and US$ 840 per metric ton MGO. Same prices both ends.

Charterers option to deduct bunkers on redelivery on last sufficient hire.

**Clause 38 :**
Owners warrant that the vessel is eligible for bunkers in areas within the agreed trading limits.

**Clause 39 :  Hire Payments**
Referring to Lines 60 and 61, where there is any failure to make "punctual and regular payment" due to oversight or negligence or error or omission of the Charterers' employees, bankers or agents or otherwise for any reason where there is absence of intention to fail to make payments as set out, Charterers shall be given by Owners two banking days notice to rectify the failure; where so rectified the payment shall stand as punctual and regular payment.

**Clause 40 :  Deviation**
Should the vessel change its intended voyage by reason of any of the causes mentioned in Clause 15 and put back into any other ports than those to which she is bound under instructions of the Charterers, the hire shall be suspended from the time of such change until the vessel is again in the same position or at a point equivalent thereto and the voyage resumed therefrom.

**RIDER CLAUSES TO M/V "SEAGREETING" CHARTER
PARTY DATED 5TH DECEMBER, 2007**

**Clause 41 :  Gear**
Owners shall maintain the gear of the ship as fitted, providing gear for all cranes capable of
handling lifts up to (see Clause 30). Owners also to provide on the vessel lights for night work
on deck and in all hatches simultaneously and maintain same in efficient working order. All
stevedore standby time (for the shift actually affected by breakdown duly backed by original
port vouchers) occasioned by deficiency of cranes and lighting shall be the responsibility of
the Owners and hire shall be proportionately reduced according to the number of cargo
spaces in which work is prevented due to such inefficiency. The Charterers have the use of all
the cranes on board the vessel.

**Clause 42 :  Gear Breakdown**
Vessel to work night and day, if required by Charterers, and all cranes to be at Charterers'
disposal during loading and discharging. In the event of a disabled crane or insufficient power
to operate cranes, Owners, through Charterers, to pay for suitable shore engine(s) or
crane(s) providing vessel remains on full hire, or hire to be reduced proportionately to the
number of cranes, for all time the crane or cranes are unavailable due to disability or loss of
power providing shore engines have not been employed at Owners' expense as above. First
opening and last closing of hatches at each port to be performed by crew free of expense to
Charterers provided permitted by local regulations.

**Clause 43 :  Boycott**
In the event of loss of time, delay or impossibility of or restriction on the working of the ship
resulting from any action that may be taken against the ship by any person on grounds due
to or connected with the country or the registration of the ship, the flag flown by the ship or
the terms and conditions on which the crew of the ship are engaged and employed by the
Owners, or as a result of her previous trading, the Owners are to remain responsible for the
aforementioned loss of time, delays or impossibility of or restrictions on working, and any
time lost consequent to the above mentioned action shall be considered as off-hire and any
extra expenses related to such action shall be payable and paid for by Owners. See also
Clause 44.

**Clause 44 :  I.T.F**
In the event of loss of time, delay or impossibility of or restrictions on the full working of the
vessel result from any action that may be taken against the ship by third parties on grounds
due to or connected with the country of the Register of the ship, the flag flown by the ship,
or the terms and conditions upon which the crew of the ship are engaged and employed by
the Owners, the Owners are to remain responsible for above mentioned loss of time, delay or
impossibility of or restrictions on working and any time lost consequent upon the above
mentioned action by third parties shall be considered as off- hire and to be deducted from
hire. Vessel's crew Ukrainian nationals all covered by Ukrainian workers federation union
agreements

**Clause 45 :  Arrest**
Should the vessel be arrested during the currency of this Charter Party at the suit of any
person having or purporting to have a claim against or any interest in the vessel, hire under
this Charter Party shall not be payable in respect of any period thereby lost. However, if
arrest caused by Charterers' action or their negligence, their agents or servants, and/or
cargoes being carried under this Charter Party, then Owners shall not be responsible.

## RIDER CLAUSES TO M/V "SEAGREETING" CHARTER
## PARTY DATED 5TH DECEMBER, 2007

**Clause 46 :   Bills of Lading**
The Charterers and/or their nominees or agents are authorized whenever required to sign Bills of Lading on Master's and/or Owners' behalf provided they are in strict conformity with Mate's receipts and to be counter-signed by the Master. Draft of Bills of Ladings to be faxed to Owners prior signature for their approval which not be unreasonably withheld. In no case through or liner Bills of Lading or Seaway Bills to be issued.

**Clause 47 :   P & I**
The Owners guarantee that the vessel is entered for full cover and shall remain entered in a Protection and Indemnity Association for the duration of this Charter Party. Owners P & I Club: "The American Club". Charterers have the use of Owners P & I Club as far as rules permit.

Charterers place their timecharter liability cover direct with: To be advised.

**Clause 48 :   Protective**
Both-to-Blame Collision Clause, BIMCO Unique B/L Identifier Clause General Average and New Jason Clause as attached to form part of this Charter Party and Bills of Lading issued under this Charter Party also contain the original or amended General Clause Paramount as attached, which also to be inserted in this Charter Party. Conwartime 1993 to be incorporated in this Charter Party and Bills of Lading issued hereunder.

**Clause 49 :   Stevedores**
Where possible at loading and discharging ports, stevedore damage, if any, to be settled directly between Owners and stevedores. Charterers only to be responsible when Master notifies in writing at the time of occurrence or as soon as possible thereafter (but no later than when the vessel sails from the port where the alleged damage occurred, except in the case of hidden damage, which to be reported latest prior to sail from discharge port) of damage to Charterers or their agents in respective ports. In such instances, Master will use best endeavours to obtain from responsible party written acknowledgement specifying extent of damage and that same will be made good after presentation of invoice if not possible to effect repairs simultaneously with loading/discharging. Should damage affect vessel's working capacity, class or seaworthiness, repairs to be effected immediately and vessel to remain on hire. All damages which are to be repaired by Charterers and which do not refer to fair wear and tear and do not affect vessel's class, seaworthiness or working capacity are to remain for occasional repair when vessel is to dock for Owners' account so that Charterers pay for the actual cost of repairs but for the time used, unless it exceeds the time used for vessel's own repairs. Owners to advise Charterers when stevedore damage has been settled between Owners and third parties. Charterers to remain ultimately responsible for the settlement of stevedore damage.

**Clause 50 :   Cargo Exclusions**
All dangerous, injurious and inflammable or IMO self-combustible cargos (IMO cargoes, BC Code Appendix "B" cargoes) and the following:
Asphalt, Ammonium nitrate, ammonium nitrate fertilizers Class "B", asbestos, acids, arms, ammunitions, aluminum ashes, aluminum nitrate, aluminum residues, barium nitrate, bombs and any kind of explosives, blasting caps and detonator caps, calcined pyrites Class "B", calcium nitrate Class "B", castor beans, charcoal, charcoal briquettes, calcium fluoride, Chilean natural nitrate potassic mixture, copra, copra meals, copra cake, copra expellers, copra pellets, dynamite, TNT, borax, calcium carbide, calcium hypochloride, concentrates, creosoted goods, cement and cement clinkers, D.R.I., ferrous metal borings, fishmeal, ferro

## RIDER CLAUSES TO M/V "SEAGREETING" CHARTER
## PARTY DATED 5TH DECEMBER, 2007

silicon, hides. HBI ,iron ore pellets /concentrates/fines metallized, iron oxide spent, lead nitrate, livestock, lime, logs of any kind, magnesia, magnesium nitrate, metal sulphide concentrates Class "B", nuclear and radioactive goods or wastes of any kind, naphtha, olivine, pyrites ore, petroleum and all its by-products, petcoke, peatmoss, pitch, prill, potassium notrate, potassium / sodium nitrate mixture, quicklime, vanadium ore, refuse and garbage of any kind, resins, radio isotopes, sawdust, seed cakes Class "B", sodium / potassium nitrate mixture, sunflower seeds and expellers, soda ash, sulphur, salt, all oily scraps including MBT, sponge iron, turpentine, tar, ammonium sulphate, tancage, tankage ferilisers, woodchips , woodpulp pellets . always harmless bulk cargo in accordance with vessel's stability, safe trim and booklet.

For permissible scrap loading soft loading Clause to apply.

Charts are allowed to carry one cargo of clinker/petcoke, but not beinf the last prior redely.

### Clause 51 :  Hold Cleaning
Lumpsum in lieu of hold cleaning on redelivery US$ 5,000 including lashing/dunnage/debris removal.

Intermediate hold cleaning by vessel's crew : US$ 400 per hold lumpsum.

### Clause 52 :  Trading Exclusions
Trading always within Institute Warranty Limits and always excluding the following countries: Israel, Turkish occupied Cyprus, Syria, Libya, former Yugoslavia except Slovenia and Croatia (which allowed), Albania, Cuba, Iraq, North Korea, CIS Pacific, Australia, New Zealand, USA, Somalia, Nigeria, Angola, Kampuchea, Liberia, Yemen, Haiti, Jordan, Eritrea, Nicaragua, Sri Lanka, Sierra Leone, Amazon River, Orinoco river, Sea of Azov, Colombia and all war risk/like areas (where additional war risk premiums apply).

Vessel not to trade directly between China Taiwan. and always excluding ice bound ports/places/areas.

Piracy and Security Clause:
In case of any civil strife fears of piracy etc., Owners have the option with prior notice to Charterers to slow steam vessel at anchorage or move from berth to anchorage however owners/masters decision not to be unreasonable. Vessel always to remain on hire. Cost of shore security men if any as required and appointed by Owners to be split between Owners and Charterers.

Charterers are permitted one call at Bangladesh subject to Owners protection clause.
Charterers are permitted to trade Bangladesh maximum one call with Owners protective clause as follows:

Bill of Lading weight to be checked against a joint draft survey at both load and discharge ports. If Bills of Lading and survey weight are compatible, vessel/Owners not to be responsible for any shortlanding claims made by whomsoever. Owners liability for any cargo claims to be restricted to the difference, if any, in between the Bills of Lading quantity as per draft survey at loading port and draft survey at discharging port prior commencement of discharge. Any other cargo claims/shortage to be always on Charterers account and vessel always remaining on hire and such claims to be settled directly between Charterers and receivers or other relevant parties. Charterers to always remain responsible/liable for all costs/consequences arising thereof (including time lost if any for such trading/calls).

- 6 -

## RIDER CLAUSES TO M/V "SEAGREETING" CHARTER PARTY DATED 5TH DECEMBER, 2007

Any extra war risk insurance incurred under this Charter Party to be for Charterers account as charged by Owners underwriters provided not exceeding Lloyds of London scale.

Conwartime 93 Clause to apply in full. Any other areas wherein there is an outbreak of war or hostilities to be always excluded areas.

Vessel not to trade in area(s)/port(s) having ice or ice like conditions and vessel not to force ice or follow icebreakers.

NAABSA not permitted.

California ballast water fees to be for Charterer's account.

Charterers to pay for and arrange all compulsory and customary inward/outward and inland pilotages including but not limited to Skaw Sound/Great Belt, Bosporus/Dardanelles, Japanese/Chinese inland sea pilotages to be for Charterers account.

### Clause 53 : Hire
Hire to be telegraphically transferred to:

DOMINA SHIPMANAGEMENT LTD
Iban No            : GR 5502 8030 1000 0000 1051 17422
Ben. Bank          : EGNATIA BANK S.A. 116 KOLOKOTRONI STR., PIRAEUS, GREECE
Ben. Account No    : 0105 117422
Swift, Aba Transit No : EGNAGR2T
Corp. Bank Name Swift : BANK OF NEW YORK, USA, IRVTUS3N
Account No         : 890  005 5561

First hire along with price of bunkers on board to be paid within 3 banking days after vessels delivery and Charterers' receipt of copy relevant invoice, thereafter hire to be paid every 15 days in advance. Subsequent charter hire to be paid as per redelivery notice.

### Clause 54 : Cargo Claims
Cargo claims to be settled in accordance with NYPE Interclub Agreement and any amendments thereto.

### Clause 55 : Deleted

### Clause 56 : Beaufort Scale
The words "good weather conditions" in lines 9/10 of the Charter Party shall mean any weather condition in which the wind does not exceed force four (4) of the Beaufort scale. Any adverse current to be taken into consideration when assessing vessel's speed/consumption performance. Charterers have the right to appoint and pay for an Independent Weather Bureau's advice to follow up and verify vessel's performance during the currency of this Charter Party. Evidence of weather conditions shall be taken from vessel's deck logs and Independent Weather Bureau reports.

### Clause 57 : Agents
Owners to have the option of using Charterers' agents at ports of call for minor ordinary Owners' matters at no extra fee, but all expenses involved to be for Owners' account.

**RIDER CLAUSES TO M/V "SEAGREETING" CHARTER
PARTY DATED 5TH DECEMBER, 2007**

**Clause 58 :  Representation**
Charterers to pay Owners a lumpsum of US$ 1,250 per month or pro rata on account of cables sent on Charterers' behalf/victualling and representation.

**Clause 59 :  Watchmen**
Compulsory gangway watchmen, if required to be for Charterers' account. If vessel loading bagged cargo, tallymen and watchmen to be for Charterers' account.

**Clause 60 :  Diesel Oil in Port**
The vessel to have the liberty of using Diesel Oil when entering and leaving port and for manoeuvering in shallow, restricted, narrow waters.

**Clause 61 :  Performance Claims Clause**
Any claims by Charterers relating to the performance of the vessel and/or the vessel's equipment, including speed claims, are to be submitted to Owners in the form of a statement of claim with supporting documents within 90 days of the completion of the voyage concerned or otherwise by waived "nullified".

**Clause 62 :  Taxes**
All taxes and/or dues on the vessel and/or cargo and/or charter hire and/or freight (except income tax and/or tax on timecharter hire levied in the country of the vessel and/or her Owners domicile) arising out of cargoes carried or ports visited under the Charter Party shall be for Charterers' account.

**Clause 63 :**
In case original Bill(s) of Lading are not ready/did not arrive before vessel's arrival to discharge port(s) then Owners/Master agree and will permit to discharge entire cargo against an L.O.I as per Owners' standard P and I wording signed by Charterers.

Charterers to forward original Bill(s) of Lading to Owners as soon as possible thereafter. Original L.O.I. also to be forwarded without delay.

**Clause 64 :  Itinerary of Vessel**
Charterers undertake to inform Owners during the period of Charter as regards the itinerary of the vessel and the names and full styles of their agents at ports of call whenever required by Owners.

**Clause 65 :**
Charterers have the right to utilise cargo handling equipment/machinery in vessel's holds in order to facilitate stowage and/or trimming, always subject to tanktop restrictions and Master's approval, which not to be unreasonably withheld.

**Clause 66 :  Stowage of Different Commodities**
In case of loading different bulk commodities in the vessel, the stowage of these cargoes shall be subject to Master's satisfaction and subject to natural separation or segregation only. Otherwise co-mingling risk to be for Charterers' account and the following clause to apply:

- 8 -

## RIDER CLAUSES TO M/V "SEAGREETING" CHARTER
## PARTY DATED 5TH DECEMBER, 2007

Charterers to separate different grades of cargo by erecting steel (or any suitable) separations to Master's satisfaction which not to be unreasonably withheld. Charterers to erect, dismantle, remove and dispose of the said separations at their risk and cost. Charterers to remain responsible and hold Owner's harmless for any cross contamination claims including for any loss of time by any detention or arrest (vessel to always remain on hire), shortage or damage claim (Charterers to arrange for necessary security) arising thereof. Furthermore, Charterers to remain responsible for rectifying any damage to the vessels holds, as a consequence of the erection of separations.

### Clause 67 :   Arbitration Clause
This Charter Party shall be governed by English Law and any dispute arising out of or in connection with this Charter shall be submitted to the exclusive jurisdiction of the High Court of Justice in England and Wales.

Owners and Charterers irrevocably appoint their respective brokers to accept service in respect of any and all proceedings commenced in the High Court of Justice.

### Small Claims Clause
Notwithstanding anything to the contrary in this Charter Party, the parties agree that all arbitration's where the amount in issue in the dispute(s) is less than US$50,000 shall be conducted according to the Small Claims Procedure 1989 (S.C.P.) of the London Maritime Arbitrators Association (as amended from time to time).

### Clause 68 :
Charterers' right to request and obtain information from Owners and/or Master regarding stowage, trim and other aspects of the vessel's capacity and performance.

### Clause 69 :
Charterers shall furnish Master from time to time with all requisite instructions and sailing directions, in writing or by telegram, and the Master shall keep a full and correct log of the voyage or voyages, showing interalia the course of the vessel and distance run and the consumption of fuel oil, which is to be patent to the Charterers or their agents, a true copy of which is to be sent to Charterers from each port of call on the voyage and immediately after completion of the voyage, together with any other information which the Master deems necessary. Charterers to keep Owners closely advised of vessel's itinerary.

Master to assist Charterers with any information required.

### Clause 70 :
Deleted.

### Clause 71 :
Before and on arrival at a port, vessel's Officers/crew to shape up vessel's hatches, cranes/derricks and gangway in order to commence loading and/or discharging without delay. First opening/last closing of all hatch covers shall be done by Officers/crew, free of cost to Charterers, if allowed by shore regulations.

## RIDER CLAUSES TO M/V "SEAGREETING" CHARTER
## PARTY DATED 5TH DECEMBER, 2007

**Clause 72 :**
The Master shall supervise stowage of the cargo thoroughly together with Charterers' representative, and let one of his Officers assist to supervise all loading, handling and discharge of the cargo and he is to furnish Charterers with stowage plan.

**Clause 73 :**
Delivery and redelivery times to be calculated basis GMT.

**Clause 74 :**
No deck cargo to be loaded.

**Clause 75 :**
Any delays caused by vessel's failure to pass USCG/port state control inspection, or delays caused by vessel requiring re-inspection as a result of defects found on previous call, to be for Owners' account.

**Clause 76 :**
Deleted.

**Clause 77 :**
Deleted.

**Clause 78 :**
Negotiations and trade to be kept strictly Private and Confidential between parties involved and not to be reported by any party involved in this fixture.

**Clause 79 :**
Charterers will supply and pay for Ramnek tape for their own account after completion of loading.

**Clause 80 :**
Freshwater consumed under this charter for the purpose of drinking, washing of Master/Officers/Crew on board to be for Owners' account, and same used by stevedores and/or for the purpose of hold cleaning and/or for any other Charterers business to be for Charterers' account.

**Clause 81 :** Deleted

**Clause 82 :**
Owners are signatories to the U.S. Sea Carriers Initiative Agreement and will endeavour to take all steps possible to avoid drug trafficking.

Charterers will use best endeavours to prevent vessel being used for drug smuggling.

**RIDER CLAUSES TO M/V "SEAGREETING" CHARTER
PARTY DATED 5TH DECEMBER, 2007**

**Clause 83 :**
Should the vessel be requisitioned (as per Government decree) by the Government of the vessel's flag during the period of the charter, the vessel shall be deemed to be off hire during the period of such requisition and any hire paid by the said government in respect of such requisition period shall be retained by Owners. However Charterers shall have the option to cancel the balance period of this charter.

**Clause 84 :** Deleted

**Clause 85 :**
If coal carried, cost of equipment to be placed on board for monitoring temperature, gas contents etc., if required by IMO Regulations, to be for Charterers' account.

**Clause 86 :**
All cargo to be loaded in accordance with latest IMO/flag state/class requirements.

**Clause 87 :**
Vessel not to carry any cargo in contravention of existing or future United Nations or U.S. Government sanctions.

**Clause 88 : Bulk Carrier Safety Clause**
(a) The Charterers shall instruct the Terminal Operators or their representatives to co-operate with the Master in completing the IMO SHIP/SHORE SAFETY CHECKLIST and shall arrange all cargo operations strictly in accordance with the guidelines set out therein.

(b) In addition to the above and notwithstanding any provision in this Charter Party in respect of loading/discharging rates, the Charterers shall instruct the Terminal Operators to load/discharge the vessel in accordance with the loading/discharging plan, which shall be approved by the Master with due regard to the Vessel's draught, trim, stability, stress or any other factor which may affect the safety of the vessel.

(c) At any time cargo operations the Master may, if he deems it necessary for reasons of safety of the vessel, instruct the Terminal Operators or their representatives to slow down or stop the loading or discharging.

(d) For Compliance with the provisions of this Clause the vessel to be deemed 'on-hire'.

**Clause 89 :** Deleted

**Clause 90 :**
Owners option to arrange P and I preloading cargo survey for steels, same to be for Owners account/time, for semi-finished steel cargoes. For finished steel cargoes then cost/time of preloading steel survey to be for Charterers account.

**Clause 91 :**
Vessel to be delivered with clean, dry hold, free from smell, loose rust scale, residue or previous cargoes to shippers surveyors satisfaction. Failing which vessel to be off-hire until

## RIDER CLAUSES TO M/V "SEAGREETING" CHARTER
## PARTY DATED 5TH DECEMBER, 2007

surveyor accepts vessel's holds for loading. all costs to be for Owners account including any stevedore stand-by cost but limited to one shift.


**THE OWNERS**                                    **THE CHARTERERS**


- 12 -

**RIDER CLAUSES TO M/V "SEAGREETING" CHARTER
PARTY DATED 5TH DECEMBER, 2007**

**BIMCO CONWARTIME 1993**

1. For the purpose of this Clause, the words:

(a) "Owners" shall include the shipowners, bareboat Charterers, disponent owners, managers or other operators who are charged with the management of the vessel, and the Master; and

(b) "War Risks" shall include any war (whether actual or threatened), act of war, civil war, hostilities, revolution, rebellion, civil commotion, warlike operations, the laying of mines (whether actual or reported), acts of piracy, acts of terrorists, acts of hostility or malicious damage, blockades (whether imposed against all vessels or imposed selectively against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever), by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the vessel, her cargo, crew or other persons on board the vessel.

2. The vessel, unless the written consent of the Owners be first obtained, shall not be ordered to or required to continue to or through, any port, place, area or zone (whether of land or sea), or any waterway or canal, where it appears that the vessel, her cargo, crew or other persons on board the vessel, in the reasonable judgement of the Master and/or the Owners, may be, or are likely to be, exposed to War Risks. Should the vessel be within any such place as aforesaid, which only becomes dangerous, or is likely to be or to become dangerous, after her entry into it, she shall be at liberty to leave it.

3. The vessel shall not be required to load contraband cargo, or to pass through any blockade, whether such blockade be imposed on all vessels, or is imposed selectively in any way whatsoever against vessels of certain flags or Ownership, or against certain cargoes or crews otherwise howsoever, or to proceed to an area where she shall be subject or is likely to be subject to a belligerent's right of search and/or confiscation.

4. (a) The Owners may effect war risks insurance in respect of Hull and Machinery of the vessel and their interests (including, but not limited to, loss of earnings and detention, the crew and their Protection and Indemnity Risks) and the premiums and/or calls therefor shall be for their account.

(b) If the Underwriters of such insurance should require payment of premiums and/or calls because, pursuant to the Charterers' orders, the vessel is within, or is due to enter and remain within, any area or areas which are specified by such Underwriters as being subject to additional premiums because of War Risks, then such premiums and/or calls shall be reimbursed by the Charterers to the Owners at the same time as the next payment of hire is due.

5. If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then such bonus or additional wages shall be reimbursed to the Owners by the Charterers at the same time as the next payment of hire is due.

6. The vessel shall have liberty:

(a) to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery, or in any other way whatsoever, which are given by the government of the nation under whose flag the vessel sails, or other government to whose laws the Owners are subject, or any other government, body or group whatsoever acting with the power to compel compliance with their orders or directions;

## RIDER CLAUSES TO M/V "SEAGREETING" CHARTER
## PARTY DATED 5TH DECEMBER, 2007

(b) to comply with the order, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance;

(c) to comply with the terms of any resolution of the Security Council of the United Nations, any directives of the European Community, the effective orders of any other supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;

3. The vessel shall not be required to load contraband cargo, or to pass through any blockade, whether such blockade be imposed on all vessels, or is imposed selectively in any way whatsoever against vessels of certain flags or Ownership, or against certain cargoes or crews otherwise howsoever, or to proceed to an area where she shall be subject or is likely to be subject to a belligerent's right of search and/or confiscation.

4. (a) The Owners may effect war risks insurance in respect of Hull and Machinery of the vessel and their interests (including, but not limited to, loss of earnings and detention, the crew and their Protection and Indemnity Risks) and the premiums and/or calls therefor shall be for their account.

(b) If the Underwriters of such insurance should require payment of premiums and/or calls because, pursuant to the Charterers' orders, the vessel is within, or is due to enter and remain within, any area or areas which are specified by such Underwriters as being subject to additional premiums because of War Risks, then such premiums and/or calls shall be reimbursed by the Charterers to the Owners at the same time as the next payment of hire is due.

5. If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then such bonus or additional wages shall be reimbursed to the Owners by the Charterers at the same time as the next payment of hire is due.

6. The vessel shall have liberty:

(a) to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery, or in any other way whatsoever, which are given by the government of the nation under whose flag the vessel sails, or other government to whose laws the Owners are subject, or any other government, body or group whatsoever acting with the power to compel compliance with their orders or directions;

(b) to comply with the order, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance;

(c) to comply with the terms of any resolution of the Security Council of the United Nations, any directives of the European Community, the effective orders of any other supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;

(d) to divert and discharge at any other port any cargo or part thereof which may render the vessel liable to confiscation as a contraband carrier;
(e) to divert and call at any other port to change the crew or any part thereof or other persons on board the vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions.

**RIDER CLAUSES TO M/V "SEAGREETING" CHARTER
PARTY DATED 5TH DECEMBER, 2007**

7. If in accordance with their rights under the foregoing provisions of this Clause, the Owners shall refuse to proceed to the loading or discharging port, or any one or more of them, they shall immediately inform the Charterers. No cargo shall be discharged at any alternative port without first giving the Charterers notice of the Owners' intention to do so and requesting them to nominate a safe port for such discharge. Failing such nomination by the Charterers within 48 hours of the receipt of such notice and request, the Owners may discharge the cargo at any safe port of their own choice.

8. If in compliance with any provisions of sub-clauses (2) to (7) of this Clause anything is done or is not done, such shall not be deemed a deviation, but shall be considered as due fulfillment of this Charter Party.

## NEW BOTH TO BLAME COLLISION CLAUSE

If the liability for any collision in which the vessel is involved while performing this Charter Party falls to be determined in accordance with the laws of the United States of America, the following clause shall apply:

## BOTH TO BLAME COLLISION CLAUSE

"If the ship comes into collision with another ship as result of the negligence of the other ship and any act, neglect or default of the master, mariner, pilot or the servants of the carrier in the navigation or in the management of the ship, the owners of the goods carried hereunder will indemnify the carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss or liability represents loss of or damage to or any claim whatsoever of the owners of the said goods, paid or payable by the other non-carrying ship or her owners to the owners of the said goods and set off, recouped or recovered by the other or non-carrying ship or her owners as part of their claim against the carrying ship or carrier.

The foregoing provisions shall also apply where the Owners, Operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or contact."

and the Charterers shall procure that all Bills of Lading issued under this Charter Party shall contain the same clause.

## GENERAL AVERAGE AND THE NEW JASON CLAUSE

General Average shall be adjusted according to York/Antwerp Rules, 1974, but where the adjustment is made in accordance with the law and practice of the United States of America, the following clause shall apply

## NEW JASON CLAUSE

In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract or otherwise, the goods, shippers, consignees, or owners of the goods shall contribute with the carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the goods.

If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery.

- 15 -

**RIDER CLAUSES TO M/V "SEAGREETING" CHARTER
PARTY DATED 5TH DECEMBER, 2007**

### U.S. TRADE - UNIQUE BILL OF LADING IDENTIFIER CLAUSE

The Charterers warrant that each transport document accompanying a shipment of cargo destined to a port or place in the United States of America shall have been endorsed with a Unique Bill of Lading Identifier as required by the U.S. Customs Regulations (19 CFR Part 4 Section 4.7 A) including subsequent changes, amendments or modifications thereto, not later than the first port of call.

Non-compliance with the provisions of this clause shall amount to a breach of warranty for the consequences of which the Charterers shall be liable and shall hold Owners harmless and shall keep them indemnified against all claims whatsoever which may arise and be made against them.

Furthermore, all time lost and all expenses incurred including fines as a result of the Charterers' breach of the provisions of this Clause shall be for Charterers' account.

### ISPS CLAUSE FOR TIME CHARTER PARTIES

a. i From the date of coming info force of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of Solas (ISPS Code) in relation to the vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the vessel and "the Company" (as defined by the ISPS Code) shall comply with the requirements of the ISPS Code relating to the vessel and "the Company". Upon request the Owners shall provide a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) to the Charterers. The Owners shall provide the Charterers with the full style contact details of the Company Security Officer (CSO).

ii Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Owners or 'the Company" to comply with the requirements of the ISPS Code or this clause shall be for the Owners' account.

b. i The Charterers shall provide the CSO and the Ship Security Officer (SSO)/Master with their full style contact details and, where sub-Jetting is permitted under the terms of this Charter Party, shall ensure that the contact details of all Sub-Charterers are likewise provided to the CSO and the SSO/Master. Furthermore, the Charterers shall ensure that all Sub-Charter Parties they enter into during the period of this Charter Party contain the following provision:

"The Charterers shall provide the Owners with their full style contact details and, where sub-letting is permitted under the terms of the Charter Party, shall ensure that the contact details of all Sub-Charterers are likewise provided to the Owners".

ii Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Charterers to comply with this clause shall be for the Charterers account.

c. Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port

facility or any relevant authority in accordance with the ISPS Code including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the Owners' negligence or from vessel's previous trading or cargoes carrier prior to delivery. Owners also warrant that vessels crew has all requisite papers on board for trading to USA.

- 16 -

## RIDER CLAUSES TO M/V "SEAGREETING" CHARTER
## PARTY DATED 5TH DECEMBER, 2007

All measures required by the Owners to comply with the ship security plan shall be for the Owners' account.

d. If either party makes any payment which is for the other party's account according to this clause, the other party shall indemnify the paying party.

### US CUSTOMS ADVANCE NOTIFICATION/AMS CLAUSE FOR TIME CHARTER PARTIES

a If the vessel loads or carries cargo destined for the US or passing through US ports in transit, the Charterers shall comply with the current US Customs Regulations (19 CFR 4.7) or any subsequent amendments thereto and shall undertake the role of carrier for the purposes of such regulations and shall, in their own name, time and expense:

i Have in place a SCAC (Standard Carrier alpha code)
ii Have in place an ICB (International Carrier Bond)
iii Provide the Owners with a timely confirmation of i) and ii) above and
iv Submit a cargo declaration by AMS (Automated Manifest System) to the US Customs and provide the Owners at the same time with a copy thereof

b The Charterers assume liability for and shall indemnify, defend and hold harmless the owners against any loss and/or damage whatsoever (including consequential loss and/or damage) and/or any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Charterers' failure to comply with any of the provisions of sub-clause (a). Should such failure result in any delay then, notwithstanding any provision in this Charter Party to the contrary, the vessel shall remain on hire.

c If the Charterers' ICB is used to meet any penalties, duties, taxes or other charges which are solely the responsibility of the Owners, the Owners shall promptly reimburse the Charterers for those amounts.

d The assumption of the role of carrier by the Charterers pursuant to this clause and for the purpose of the US Customs Regulations (19 CFR 4.7) shall be without prejudice to the identity of carrier under any Bill of Lading, other contract, law or regulation.

### BIMCO STANDARD ISM CLAUSE FOR VOYAGE AND TIME CHARTERPARTIES

From the date of coming into force of the International Safety Management (ISM) Code in relation to the Vessel and thereafter during the currency of this Charterparty, the Owners shall procure that both the Vessel and "the Company" (as defined by the ISM Code) shall comply with the requirements of the ISM Code. Upon request the Owners shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers.

'Except as otherwise provided in this Charterparty, loss damage, expense or delay caused by failure on the part of the Owners or 'the Company' to comply with the ISM Code shall be for the 'Owners account'

# EXHIBIT D



# INTRESCO LIMITED

International Repair and Shipping Company Limited

SHIP MANAGEMENT, CHARTERING, SHIP REPAIRING AND TECHNICAL MANAGEMENT

London 05 December 2007

To : The Owners / Managers of M/v SEAGREETING

Ref: Mv Seagreeting / Medway C/P Dated 05.12.2007

INTRESCO LIMITED
3RD Floor
3 Harbour Exchange Square
London E14 9GE

VAT No.

being commercial managers of:

MV SANTANA, BULK CARRIER, DWT 50271, 2001, CLASS RS, GEARED IMO 9237101
MV SCANDA, BULK CARRIER, DWT 40187, 1990, CLASS RS, GEARED IMO 8807703
MV SPECTRA, BULK CARRIER, DWT 38883, 1985, CLASS RS, GEARED IMO 8405751
MV SACURA, BULK CARRIER, DWT 27082, 1981, CLASS RS, GEARED IMO 800551

hereby guarantees the performance, hire payments and any amounts/duties/liabilities due,
for and on behalf of:

Messrs.
Medway Chartering Ltd
50 Shirley Street
Nassau
Bahamas

under the above Charter Party as governed by English Law.

Yours faithfully,

Mauro Formentin MICS
Director
INTRESCO LTD.

INTRESCO LIMITED
Registered in England
Registered No. 3688121
Member of INTRESCO GROUP

HEAD OFFICE AND POST ADDRESS:
Level 3. 3 Harbour Exchange Square
London E14 9GE
United Kingdom

CONTACTS:
Tel:    + 44 20 7517 8820
Fax:    + 44 20 7517 8821
E-mail:  mail@intresco.com

# EXHIBIT E

# LYONS & FLOOD, LLP

### ATTORNEYS AT LAW

65 WEST 36TH STREET, 7TH FLOOR
NEW YORK, NEW YORK 10018

TELEPHONE: (212) 594-2400
FAX: (212) 594-4589

LAWRENCE BARRON
E-Mail: lbarron@lyons-flood.com

February 11, 2008

**BY TELEFAX and**
**INTERNATIONAL MAIL-**        **+44 20 7517 8821**
**RETURN RECEIPT REQUESTED**

Intresco Limited.
Level 3, 3 Harbour Exchange Square
London, E14 9GE, United Kindom

Re:    Domina Shipmanagement Ltd., v. Medway Chartering Ltd., et al.
       08 Civ. 01155
       Our File: 2652006

Dear Sirs:

We are New York attorneys for Domina Shipmanagement Ltd. On behalf of
Domina Shipmanagement Ltd., we have commenced a lawsuit in New York pursuant to
Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the
Federal Rules of Civil Procedure, seeking attachment and garnishment of property of
Medway Chartering Ltd., and Intresco Ltd., as security for plaintiff's claims for unpaid
hire. The lawsuit is captioned Domina Shipmanagement Ltd. v. Medway Chartering Ltd.,
a/k/a Medway Chartering Bahamas, a/k/a Medway Chartering and Intresco Limited, a/k/a
Intresco Ltd., a/k/a Intresco, 08 CV. 01155 (RWS), and is pending in the United States
District Court for the Southern District of New York.

Pursuant to the court's Ex Parte Order for Process of Maritime Attachment and
Garnishment and the Process issued thereunder, we have been advised by Deutsche Bank
that on February 8, 2008, an electronic fund transfer in the amount of $34,590.24
originating from Intresco Limited has been restrained.

NEW JERSEY OFFICE:
1405 MORRIS AVENUE
UNION, NJ 07083
TEL: (201) 569-4425    FAX: (201) 569-4438

CONNECTICUT OFFICE:
19 COVENTRY LANE
RIVERSIDE, CT 06878
TEL: (203) 661-2355    FAX: (203) 661-2577

This is the notification required under Local Admiralty Rule B.2 of the Local Rules of Civil Procedure of the United States District Court for the Southern District of New York. Additionally, enclosed are copies of the Summons, Verified Complaint, Ex Parte Order for Process of Maritime Attachment and Garnishment and Process of Maritime Attachment and Garnishment.

Very truly yours,

Lyons & Flood, LLP

Lawrence J. Barron

Enclosures

-2-

02/15/2008 17:12 FAX 212 504 4589    LYONS FLOOD    @005/009

# United States District Court

### SOUTHERN ____ DISTRICT OF ____ NEW YORK

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

DOMINA SHIPMANAGEMENT LTD.,

**ECF CASE**

# EXHIBIT F

# LYONS & FLOOD, LLP
### ATTORNEYS AT LAW

65 WEST 36TH STREET, 7TH FLOOR
NEW YORK, NEW YORK 10018

TELEPHONE: (212) 594-2400
FAX: (212) 594-4589

LAWRENCE J. BARRON
E-Mail: lbarron@lyons-flood.com

February 12, 2008

**BY TELEFAX and**          +44 20 7517 3821
**INTERNATIONAL MAIL-**
**RETURN RECEIPT REQUESTED**

Intresco Limited.
Level 3, 3 Harbour Exchange Square
London, E14 9GE, United Kingdom

Re:  Domina Shipmanagement Ltd., v. Medway Chartering Ltd., et al.
     08 Civ. 01155 (RWS)
     Our File: 2652006

Dear Sirs:

As you are aware from our letter dated February 11, 2008, we are New York attorneys for Domina Shipmangement Ltd. ("Domina"), and that on behalf of Domina we have commenced a lawsuit in New York pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, seeking attachment and garnishment of property of Medway Chartering Ltd., and Intresco Ltd., as security for plaintiff's claims for unpaid hire.

The lawsuit is captioned Domina Shipmangement Ltd. v. Medway Chartering Ltd., a/k/a Medway Chartering Bahamas, a/k/a Medway Chartering and Intresco Limited, a/k/a Intresco Ltd., a/k/a Intresco, 08 CV. 01155 (RWS), and is pending in the United States District Court for the Southern District of New York.

Pursuant to the court's Ex Parte Order for Process of Maritime Attachment and Garnishment and the Process issued thereunder, we have been advised by Deutsche Bank on February 11, 2008, that an Electronic Fund Transfer ("EFT"), originating from Intresco Limited in the amount of $79,107.00, has been restrained.

NEW JERSEY OFFICE:
1495 MORRIS AVENUE
UNION, NJ 07083
TEL: (201) 569-4435  FAX: (201) 569-4438

CONNECTICUT OFFICE:
19 COVENTRY LANE
RIVERSIDE, CT 06878
TEL: (203) 661-2355  FAX: (203) 661-2577

The above restrained EFT is in addition to the EFT that was restrained by Deutche Bank on February 8, 2008, in the amount of $34,590.24, as we advised you of in our letter dated February 11, 2008.

This is the notification required under Local Admiralty Rule B.2 of the Local Rules of Civil Procedure of the United States District Court for the Southern District of New York.

Very truly yours,

Lyons & Flood, LLP

Lawrence J. Barron

Enclosures

- 2 -

# EXHIBIT G

# LYONS & FLOOD, LLP

### ATTORNEYS AT LAW

65 WEST 36TH STREET, 7TH FLOOR
NEW YORK, NEW YORK 10018

TELEPHONE: (212) 594-2400
FAX: (212) 594-4589

LAWRENCE J. BARRON
E-Mail: lbarron@lyons-flood.com

February 13, 2008

**BY TELEFAX and**                                **+44 20 7517 8821**
**INTERNATIONAL MAIL-**
**RETURN RECEIPT REQUESTED**

Intresco Limited.
Level 3, 3 Harbour Exchange Square
London, E14 9GE, United Kingdom

Re:    Domina Shipmanagement Ltd., v. Medway Chartering Ltd., et al.
       08 Civ. 01155 (RWS)
       Our File: 2652006

Dear Sirs:

As you are aware from our letters dated February 11, 2008 and February 12,
2008, we are New York attorneys for Domina Shipmangement Ltd. ("Domina"), and that
on behalf of Domina we have commenced a lawsuit in New York pursuant to Rule B of
the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules
of Civil Procedure, seeking attachment and garnishment of property of Medway
Chartering Ltd., and Intresco Ltd., as security for plaintiff's claims for unpaid hire.

The lawsuit is captioned Domina Shipmangement Ltd. v. Medway Chartering
Ltd., a/k/a Medway Chartering Bahamas, a/k/a Medway Chartering and Intresco Limited,
a/k/a Intresco Ltd., a/k/a Intresco, 08 CV. 01155 (RWS), and is pending in the United
States District Court for the Southern District of New York.

Pursuant to the court's Ex Parte Order for Process of Maritime Attachment and
Garnishment and the Process issued thereunder, we have been advised by counsel for JP
Morgan Chase Bank on February 13, 2008, that an Electronic Fund Transfer ("EFT"),
being transferred to the account of Intresco Limited in the amount of $6,449.50, has been
restrained.

NEW JERSEY OFFICE:                            CONNECTICUT OFFICE:
    1495 MORRIS AVENUE                            19 COVENTRY LANE
    UNION, NJ 07083                               RIVERSIDE, CT 06878
    TEL: (201) 569-4435  FAX: (201) 569-4438      TEL: (203) 661-2355  FAX: (203) 661-2577

The above restrained EFT is in addition to the two EFTs that were restrained by Deutche Bank as follows.

- An EFT was restrained on February 8, 2008, in the amount of $34,590.24, as we advised in our letter dated February 11, 2008; and

- An EFT was restrained on February 11, 2008, in the amount of $79,107.00 as we advised in our letter dated February 12, 2007.

This is the notification required under Local Admiralty Rule B.2 of the Local Rules of Civil Procedure of the United States District Court for the Southern District of New York.

Very truly yours,

**Lyons & Flood, LLP**

Lawrence J. Barron

-2-

# EXHIBIT H

# LYONS & FLOOD, LLP

### ATTORNEYS AT LAW

65 WEST 36TH STREET, 7TH FLOOR
NEW YORK, NEW YORK 10018

TELEPHONE: (212) 594-2400
FAX: (212) 594-4589

KIRK M. LYONS
E-Mail: klyons@lyons-flood.com

ADMITTED IN NEW YORK,
CONNECTICUT, NEW JERSEY,

& MASSACHUSETTS

February 15, 2008

**BY TELEFAX**                              **+380 482 346638**

Intresco Limited.
Office 72, 12th Floor
15 Bolshaya Arnutskaya Street
65125 Odessa, Ukraine

Re:    Domina Shipmanagement Ltd., v. Medway Chartering Ltd., et al.
       <u>08 Civ. 01155 (RWS)</u>
       Our File: 2652006

Dear Sirs:

For the sake of good order, we write to advise you that four separate attachments of Electronic Fund Transfers (EFTs) have been restrained in New York, either originating from or being sent to Intresco Ltd. Previously, we forwarded three letters to Intresco Limited's United Kingdom office to provide them with notice of the three attachments that had occurred prior to February 14, 2008. (Please find copies of these letters dated February 11, 2008, February 12, 2008, and February 13, 2008, enclosed.)

The lawsuit is captioned <u>Domina Shipmangement Ltd. v. Medway Chartering Ltd., a/k/a Medway Chartering Bahamas, a/k/a Medway Chartering and Intresco Limited, a/k/a Intresco Ltd., a/k/a Intresco</u>, 08 CV. 01155 (RWS), and is pending in the United States District Court for the Southern District of New York.

Pursuant to the court's Ex Parte Order for Process of Maritime Attachment and Garnishment and the Process issued thereunder, we have been advised by counsel for JP Morgan Chase Bank on February 14, 2008, that an EFT, being transferred from the account of Intresco Limited in the amount of $14,968.90, has been restrained.

NEW JERSEY OFFICE:
1495 MORRIS AVENUE
UNION, NJ 07083
TEL: (201) 569-4435    FAX: (201) 569-4438

CONNECTICUT OFFICE:
19 COVENTRY LANE
RIVERSIDE, CT 06878
TEL: (203) 661-2355    FAX: (203) 661-2577

The above restrained EFT is in addition to the three previous EFTs that were restrained as follows:

- An EFT was restrained by Deutche Bank on February 8, 2008, in the amount of $34,590.24, as we advised in our letter dated February 11, 2008; and

- An EFT was restrained by Deutche Bank on February 11, 2008, in the amount of $79,107.00 as we advised in our letter dated February 12, 2008; and

- An EFT was restrained by JP Morgan Chase Bank on February 13, 2008, in the amount of $6,449.50 as we advised in our letter dated February 13, 2008.

The total amount of funds restrained is $135,115.64.

This is the notification required under Local Admiralty Rule B.2 of the Local Rules of Civil Procedure of the United States District Court for the Southern District of New York.

Very truly yours,

**Lyons & Flood, LLP**

By: _____

Kirk M. Lyons

U:\kmh\docs\2652006\Correspondence\Intresco UKraine Notice.doc

- 2 -

# EXHIBIT I

```
-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-
    From: Maritime <maritime@intresco.com>
      To: snp@intresco.com
    Date: Thursday, February 14, 2008 5:31:38 PM
 Subject: Fwd: mv Seagreeting  final statement
  Folder: Inbox/SNP
-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-
```

DATE:  Wednesday, January 23, 2008, 12:52:41 PM  REF No: INM-E135A195

attn: Maxim Khaulin

Pls find below  our msg to Oceanbreeze  including performance
report,survey report  and final statement.
Pls also find below   msg rcvd from Oceanbreeze confirming  owners
received USD 58,275.61  as per  our final statement


OCEAN BREEZE Chartering S.A.
Hadjikyriakou Avenue 27-31, Piraeus Greece
Tel    +30 210 9652399
Fax    +30 210 9601935
Email chartering@oceanbreeze.gr


maksym/vangelis
cc mauro

ref mv seagreeting/meadway

foll rcvd

quote

Subject: MV Seagreeting - Medway Chartering Limited CPDD: 05/12/2007

We acknowledge receipt of US$58,275.61 as a payment on account of the
full sum due to us of $245,988.44.  There is still an outstanding balance
due to us
of $187,712.83 which must be paid and all steps will be taken to pursue
our claim.

THNKS & BRGDS

unquote

brgrds/vangelis



[Message sent via SOFTWAY Communicator]

--
This message has been scanned for viruses and
dangerous content by MailScanner, and is
believed to be clean.



_____ NOD32 2815 (20080122) Information _____

This message was checked by NOD32 antivirus system.

http://www.eset.com

This is a forwarded message.

Originally rcvd from:    Maritime, maritime@intresco.com
Originally addressed to: chartering@oceanbreeze.gr
Date originally rcvd:    23 января 2008 г., 12:52:41
Original subject:        mv Seagreeting  final statement

=========8<======Original message text==============================

DATE:  Monday, January 21, 2008, 5:57:49 PM  REF No: INM-7B096EF3

TO Oceanbreeze
CC Mauro Formentin
FM INTRESCO LTD


Dear Sirs,

Pls find in attachment final statement of mv Seagreeting, perfomance
report and survey report. Kindly ask you to pass it to owners of mv
Seagreeting.

BRGDS
Maksym Yakovenko

MARITIME DEPARTMENT

For and on behalf of INTRESCO LTD
INTRESCO LTD - Ukraine Branch Office

Tel:     + 380 482 374000
         + 380 482 373999
Fax:     + 44 870 1211505 (via UK)
         + 380 482 346638
Tlx:     + 051 94079170 ISMD G
E-mail:   maritime@intresco.com



==================End of original msg===============================

BRGDS,
MARITIME DPT

For and on behalf of INTRESCO LTD
INTRESCO LTD - Ukraine Branch Office

Tel:     + 380 482 374000
         + 380 482 373999
Fax:     + 44 870 1211505 (via UK)
         + 380 482 346638
Tlx:     + 051 94079170 ISMD G
E-mail:   maritime@intresco.com

-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-: